UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUADA MEHIC,
       Plaintiff,


       v.                                    CIVIL ACTION NO.
                                             15-12934-IT

DANA-FARBER CANCER INSTITUTE, INC.,
MELISSA CHAMMAS and LINDA SWEENEY,
       Defendants.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS DANA-FARBER CANCER INSTITUTE, INC., MELISSA CHAMMAS,**
**AND LINDA SWEENEY'S PARTIAL MOTION TO DISMISS**
**(DOCKET ENTRY # 51)**

**January 25, 2017**

**BOWLER, U.S.M.J.**

Pending before this court is a partial motion to dismiss
filed by defendants Dana-Farber Cancer Institute, Inc. ("Dana-
Farber"), Melissa Chammas ("Chammas") and Linda Sweeney
("Sweeney") (collectively "defendants") under Fed.R.Civ.P.
12(b)(1) ("Rule 12(b)(1)") and Fed.R.Civ.P. 12(b)(6) ("Rule
12(b)(6)"). (Docket Entry # 51). Plaintiff Suada Mehic
("plaintiff") opposes the motion. (Docket Entry # 56). After
conducting a hearing, this court took the motion (Docket Entry #
51) under advisement.

PROCEDURAL BACKGROUND

In July 2014, plaintiff filed a charge with the Equal
Employment Opportunity Commission ("EEOC"). (Docket Entry # 52-

1). "Pursuant to a 'work-sharing' agreement between the EEOC and" the Massachusetts Commission Against Discrimination ("MCAD"), "'a charge filed with the EEOC is automatically referred to MCAD, the state agency.'" Williams v. City of Brockton, 59 F.Supp.3d 228, 245 (D.Mass. 2014) (quoting Leung v. Citizens Bank, 2014 WL 1343271, at *3 (D.Mass. Apr. 2, 2014)). The EEOC charge, signed by plaintiff, also stated that she "want[ed] this charge filed with both the EEOC and the State or local agency," i.e., the MCAD. The charge alleged that she was the victim of discrimination based on "national origin, (Bosnia) and [her] age (57)[1] and in retaliation for protesting the harassment," which she depicts as being falsely accused of stealing and insubordination. (Docket Entry # 52-1). Plaintiff signed the charge under penalty of perjury and, as defendants, named only her employer, Dana-Farber. The body of the charge alleges that Chammas harassed plaintiff and that plaintiff's performance was "never a problem until Ms. Chammas was hired." (Docket Entry # 52-1). It also states that plaintiff is older than both Chammas and Sweeney.

On May 20, 2016, plaintiff filed a motion to amend the complaint in this action. (Docket Entry # 38). The attached,

---

[1]  Plaintiff signed the charge on July 7, 2014, and her age was 57 years old at that time. By the time plaintiff filed the amended complaint in this action on June 27, 2016, she was 58 years old. (Docket Entry # 45, ¶ 7).

proposed amended complaint named Sweeney, Chammas and Dana-Farber and did not include a retaliation claim under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Defendants opposed the amendment on a number of grounds. On June 7, 2016, the district judge allowed the motion to amend and noted that, "Before filing, Plaintiff may omit from her proposed amended complaint any causes of action (in their entirety or as to particular Defendants) that Plaintiff no longer seeks to assert after careful review of Defendants' opposition to the motion to amend." (Docket Entry # 44).

On June 27, 2016, plaintiff filed the first amended complaint ("the amended complaint") against defendants. (Docket Entry # 45). The amended complaint sets out the following claims: (1) breach of implied covenant of good faith and fair dealing against Dana-Farber (Count I); (2) unjust enrichment against Dana-Farber (Count II); (3) tortious interference with contractual relations against Chammas and Sweeney (Count III); (4) intentional infliction of emotional distress against Chammas and Sweeney (Count IV); (5) libel and slander against Chammas and Sweeney (Count V); (6) negligent supervision against Dana-Farber (Count VI); (7) an age discrimination claim under 29 U.S.C. §§ 621, et seq. against Dana-Farber (Count VII); (8) an age discrimination claim under Massachusetts General Laws chapter 151B ("chapter 151B") against defendants (Count VIII);

(9) discrimination based upon national origin under Title VII of the Civil Rights Act of 1964 against Dana-Farber (Count IX); (10) a retaliation claim against Chammas and Sweeney under Title VII (Count X); (11) a violation of the Massachusetts Wage Act under Massachusetts General Laws chapter 149, section 148 ("section 148" or "MWA"), against defendants (Count XI); (12) a violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq., against defendants (Count XII); and (13) a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1210 et seq., against Dana-Farber (Count XIII).[2] (Docket Entry # 45).

Defendants move to dismiss counts IV and VI for lack of subject-matter jurisdiction under Rule 12(b)(1). They also seek to dismiss counts I, VIII (as to Chammas and Sweeney only), X, XI and XIII for failure to state a claim under Rule 12(b)(6).

<u>STANDARDS OF REVIEW</u>

The standard of review for a Rule 12(b)(6) motion is well established. To survive a Rule 12(b)(6) motion to dismiss, the complaint must include factual allegations that when taken as true demonstrate a plausible claim to relief even if actual proof of the facts is improbable. <u>Bell Atl. Corp. v. Twombly</u>,

---

[2] The amended complaint contains two separate counts, both denoted as "Count XII." (Docket Entry # 45). To distinguish the counts, this court refers to the ADA count, denoted as Count XII, as Count XIII.

4

550 U.S. 544, 555-58 (2007). Thus, while "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully." Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation marks and citations omitted). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown-that the pleader is entitled to relief." Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) (brackets, internal quotation marks and citations omitted). Discarding legal conclusions and taking the facts in the governing complaint as "true and read in a plaintiff's favor" even if seemingly incredible, the complaint "must state a plausible, not a merely conceivable, case for relief." Sepúlveda–Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29-30 (1st Cir. 2010).

In evaluating a Rule 12(b)(6) motion, the court may consider a limited category of documents outside the complaint without converting the motion into one for summary judgment. Such documents include public records and documents sufficiently referred to in the complaint. See Butler v. Balolia, 736 F.3d 609, 611 (1st Cir. 2013) (supplementing facts in complaint "by examining 'documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice'"); Freeman v. Town of Hudson, 714 F.3d 29, 36

(1st Cir. 2013) (court may consider "'official public records;
documents central to plaintiffs' claim; and documents
sufficiently referred to in the complaint'") (ellipses and
internal brackets omitted); Giragosian v. Ryan, 547 F.3d 59, 65-
66 (1st Cir. 2008). It is also appropriate to consider
"'documents the authenticity of which are not disputed by the
parties.'" Gargano v. Liberty Int'l Underwriters, Inc., 572
F.3d 45, 47 n.1 (1st Cir. 2009) (quoting Watterson v. Page, 987
F.2d 1, 3-4 (1st Cir. 1993)). Here, defendants filed Dana-
Farber's Sick Leave Policy in support of the Rule 12(b)(6)
motion. (Docket Entry # 52-2). Neither party disputes the
document's authenticity. Indeed, plaintiff relies on Dana-
Farber's Sick Leave Policy in her brief. (Docket Entry # 56,
pp. 9-10). The amended complaint also asserts plaintiff was
entitled to accrue sick leave and that Dana-Farber refused to
pay her accrued sick leave upon her termination. Because the
authenticity of the document is not disputed, the policy may be
considered.

Defendants also filed the EEOC complaint to support a Rule
12(b)(6) dismissal. (Docket Entry # 52-1). The amended
complaint references the discrimination charges filed with the
EEOC. (Docket Entry # 45, ¶ 133). The charge is therefore
sufficiently referred to in the amended complaint and neither
party disputes the document's authenticity. Accordingly, the

EEOC charge, cross-filed with the MCAD, is part of the Rule 12(b)(6) record.

With respect to the Rule 12(b)(1) motion, this court "must credit plaintiff's well-pled factual allegations and draw all reasonable inferences in plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010) (citing Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001)); Sánchez ex rel. D.R.-S. v. United States, 671 F.3d 86, 92 (1st Cir. 2012) ("'credit[ing] the plaintiff's well-pled factual allegations and draw[ing] all reasonable inferences in the plaintiff's favor'" under Rule 12(b)(1)) (internal citation omitted)). "The district court may also 'consider whatever evidence has been submitted, such as the depositions and exhibits submitted.'" Merlonghi v. United States, 620 F.3d at 54 (quoting Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)). Accordingly, plaintiff's affidavit (Docket Entry # 56-1), although not considered and stricken with respect to the Rule 12(b)(6) record, is properly considered and part of the Rule 12(b)(1) record. Although it is also appropriate to include both the Dana-Farber Sick Leave Policy (Docket Entry # 52-2) and the EEOC complaint (Docket Entry # 52-1), neither document is relevant to the Rule 12(b)(1) argument defendants raise.

Finally, "'Federal courts are courts of limited jurisdiction'" and "[t]he existence of subject-matter jurisdiction [is therefore] 'never presumed.'" <u>Fafel v. Dipaola</u>, 399 F.3d 403, 410 (1st Cir. 2005) (internal citations omitted). When a defendant challenges subject-matter jurisdiction, the plaintiff bears the burden of proving jurisdiction. <u>Johansen v. United States</u>, 506 F.3d 65, 68 (1st Cir. 2007). Dismissal is only appropriate when the facts alleged in the complaint, taken as true, do not support a finding of federal subject-matter jurisdiction. <u>Fothergill v. United States</u>, 566 F.3d 248, 251 (1st Cir. 2009).

<u>FACTUAL BACKGROUND</u>

In August 2003, Dana-Farber hired plaintiff as a cashier. (Docket Entry # 45, ¶ 6). Plaintiff, who was 58 years old as of June 27, 2016, worked standard hours of 9:00 a.m. to 5:00 p.m. and was paid on an hourly basis. (Docket Entry # 45, ¶¶ 7, 9). As a cashier for Dana-Farber, plaintiff's responsibilities included running the cashier's booth in the hospital lobby, performing various general accounting tasks and working with hospital staff and patients. (Docket Entry # 45, ¶ 12).

When plaintiff first began her employment, Sweeney and Tara Hershberger ("Hershberger"), who was a close friend of Sweeney, trained plaintiff. (Docket Entry # 45, ¶ 17). Shortly thereafter, plaintiff discovered that Hershberger was stealing

money from Dana-Farber by taking cash for T passes rather than depositing the money into the bank. (Docket Entry # 45, ¶ 19). Soon after plaintiff was hired in August 2003, she reported Hershberger's actions to her supervisors and Hershberger's employment was terminated shortly thereafter. (Docket Entry # 45, ¶¶ 19, 20).

Following Hershberger's termination, Sweeney began continuously reporting plaintiff as non-collaborative to management and unable to complete her work in a timely manner. (Docket Entry # 45, ¶¶ 23-24). Plaintiff informed Chammas that Sweeney would purposely "not complete tasks during Plaintiff's coverage," but Sweeney's behavior was never investigated. (Docket Entry # 45, ¶¶ 24-25). At an undetermined time, Sweeney accused plaintiff of stealing money from a patient, who indicated "it was their problem." (Docket Entry # 36, ¶ 22).

During her employment, plaintiff was assigned numerous direct managers and supervisors, many of whom were only in their positions for a few years. (Docket Entry # 45, ¶ 27). Plaintiff's managers and supervisors typically communicated with plaintiff via email or telephone and solely on an as-needed basis. (Docket Entry # 45, ¶ 28). "With each new supervisor, Plaintiff's tasks and responsibilities increased and became more complex in nature." (Docket Entry # 45, ¶ 29). During each review cycle, plaintiff received a standard salary increase that

corresponded to the original scope of her role as a cashier. (Docket Entry # 45, ¶ 35). During her tenure as a cashier, "she received letters of appreciation from senior management, hospital staff, and patients." (Docket Entry # 45, ¶ 13).

At various times, plaintiff wished to apply to a number of more senior roles within the Finance Department, but was told by Chammas and Joe Barrberio ("Barrberio") that there was no need for her to formally apply for more senior roles. (Docket Entry # 45 ¶ 34). At each review cycle, defendants informed plaintiff that her "position revaluation" was under review with Finance Management and Human Resources. (Docket Entry # 45, ¶ 36). Additionally, plaintiff was told that her salary would be appropriately adjusted to reflect her increased responsibilities once the paperwork was complete. (Docket Entry # 45, ¶ 39). In early 2010, Chammas and Barrberio promised plaintiff a promotion and salary increase. (Docket Entry # 45, ¶ 55). It was not until in or about June 2012 that plaintiff received an increase in pay. (Docket Entry # 45, ¶ 60).

"[I]n or about late 2011," Sweeney was assigned to supervise plaintiff's work. (Docket Entry # 45, ¶ 69). Plaintiff also reported to Chammas, who was in charge of conducting plaintiff's reviews. (Docket Entry # 45, ¶ 70).

Meanwhile, in 2005, plaintiff was required to arrive 15 minutes early each day to ensure that the cashier booth would

open at exactly 9:00 a.m. (Docket Entry # 45, ¶ 42). Plaintiff was informed to record her additional time as overtime and was paid for such overtime. (Docket Entry # 45, ¶¶ 43-44). As an hourly employee, plaintiff's timesheets "were approved weekly by the Finance Management." (Docket Entry # 45, ¶ 45). In February of 2012, plaintiff's manager, George Peddle ("Peddle"), requested a meeting with plaintiff to discuss matters reported to him by Chammas. (Docket Entry # 45, ¶ 46). During the meeting, Peddle informed plaintiff that Chammas demanded that plaintiff stop working overtime hours immediately. (Docket Entry # 45, ¶ 48). Additionally, plaintiff was accused of working unauthorized overtime and getting paid for it. (Docket Entry # 45, ¶ 48). Peddle informed plaintiff that she would be disciplined by Chammas for her actions. (Docket Entry # 45, ¶ 50). Plaintiff refused to accept any charges against her at the meeting with Peddle. (Docket Entry # 45, ¶ 54). When plaintiff inquired about the paperwork for her promotion and salary increase, Peddle stated that "the Human Resources Department had lost" it. (Docket Entry # 45, ¶ 55).

Plaintiff stopped working overtime immediately following her meeting with Peddle in February 2012. (Docket Entry # 45, ¶ 56). Peddle was later terminated for unknown reasons. In 2012, after Sweeney was assigned as plaintiff's direct supervisor,

plaintiff began seeing a psychologist due to stress at work. (Docket Entry # 45, ¶¶ 68-69, 128).

In or around May 2013, Sweeney and Chammas started giving plaintiff verbal warnings about her poor job performance.[3]  The warnings began after "they discovered that [p]laintiff had complained" about the false accusations to "the Partners Employees Assistance Program."  (Docket Entry # 45, ¶ 65).  In November 2013, plaintiff's replacement during her lunch hour was eliminated per the instructions of Sweeney and Chammas.  (Docket Entry # 45, ¶ 63).  Plaintiff also received constant telephone calls from Sweeney and Chammas during the busy cashier booth hours informing plaintiff of her wrongdoings.  (Docket Entry # 45, ¶ 71).  At various times, plaintiff would attempt to provide an email summary of the telephone calls intending to demonstrate a lack of wrongdoing on her part.  (Docket Entry # 45, ¶ 72).

"In late 2013, Human Resources representatives were invited to [p]laintiff's reviews, which" at this time "became a weekly occurrence, without any prior indication to Plaintiff."  (Docket Entry # 45, ¶ 75).  During reviews, Chammas and Sweeney described plaintiff as a problem and a distraction to the department.  (Docket Entry # 45, ¶ 77).  Sweeney often provided

---

[3]  The May 2013 time frame is not entirely clear because this date appears in the paragraph immediately preceding the paragraph depicting the verbal warnings in the amended complaint.  (Docket Entry # 45, ¶¶ 64-65).

coverage for plaintiff during her lunch hour. (Docket Entry # 45, ¶ 83). Hospital staff complained about poor service at the cashier booth, which prompted plaintiff to obtain letters from specific customers positively stating that she was not at the cashier booth during these times. (Docket Entry # 45, ¶ 84). Prior to this time, plaintiff had never had an incident in which patients or hospital staff members complained about her performance as a cashier. (Docket Entry # 45, ¶ 81).

Chammas issued both verbal and written warnings and a final written warning to plaintiff stating that plaintiff's performance was not improving. (Docket Entry # 45, ¶ 89). In October 2013, shortly after the final written warning, plaintiff was invited to a meeting. During the meeting, she was warned that she was not acting as "a team worker" and that this was her final warning before termination. (Docket Entry # 45, ¶ 90). The final warning also stated that plaintiff refused to go to the bank, which was an important aspect of plaintiff's job as cashier. (Docket Entry # 45, ¶ 91). Plaintiff never signed any documents presented to her by defendants alleging any wrongdoing. (Docket Entry # 45, ¶ 92). Plaintiff's last two work performance reviews were negative. (Docket Entry # 45, ¶ 94).

In December 2013, plaintiff's hours were reduced to only 3:00 p.m. to 5:00 p.m. in the cashier booth. (Docket Entry 45,

¶ 103).  Plaintiff was asked to report to the corporate office each day during these hours for a new task to purportedly help her "communicate better."  (Docket Entry # 45, ¶ 103).  On December 31, 2013, plaintiff "was injured in the course and scope of her employment with" Dana-Farber.  (Docket Entry # 45, ¶ 125).  Plaintiff encountered difficulty eating and sleeping, which contributed to her injury.  (Docket Entry # 45, ¶ 126).  Chammas "knew that [p]laintiff had a work-related injury."  (Docket Entry # 45, ¶ 127).

On January 6, 2014, plaintiff was given her first task at the corporate office consisting mainly of "filing duties for other accounting staff" within the department.  (Docket Entry # 45, ¶ 104).  The tasks assigned by Sweeney and Chammas consisted of intensive physical labor, aggravating plaintiff's previous workplace injury.  (Docket Entry # 45, ¶ 105).  Plaintiff sought medical leave for a January 21, 2014 doctor's visit, which was approved by Chammas.  (Docket Entry # 45, ¶ 129).  On January 14, 2014, plaintiff exchanged emails with a human resources department representative regarding her workplace injury and requested paperwork for her doctor to complete.  (Docket Entry # 45, ¶ 130).  Plaintiff was told by the human resources representative to meet on January 16, 2014 to receive instructions regarding the paperwork.  (Docket Entry # 45, ¶ 130).

On January 16, 2014, plaintiff was terminated. (Docket
Entry # 45, ¶ 107). At the time of termination, plaintiff was
not provided with a notice in writing. (Docket Entry # 45, ¶
107). A written notice of termination was sent to plaintiff via
email upon her request. (Docket Entry # 45, ¶ 108). The
termination notice indicated that plaintiff was terminated as a
result of her non-collaborative behavior and insubordination.
(Docket Entry # 45, ¶ 108).

Plaintiff was terminated "with no severance, unpaid, unused
personal days, or unpaid, unused sick days" and, at the time of
her termination, "was making approximately $19.80 per hour."
(Docket Entry # 45, ¶¶ 114, 115). Under Dana-Farber's Sick
Leave Policy, full-time and part-time staff members working at
least 20 hours per week are eligible for paid sick leave.
(Docket Entry # 52-2, p. 2). The policy further states that
"[s]ick leave must be used to replace regularly scheduled work
hours when staff members miss work time due to their illness or
the illness of an immediate family member." (Docket Entry # 52-
2, p. 3). Regarding the payout of sick time upon termination,
Dana-Farber's Sick Leave Policy states that unused sick time
will not be paid as a terminating benefit when the employee
leaves the employment of Dana Farber. (Docket Entry # 52-2, p.
4). Any sick time that the employee uses during the last five
days of employment will not be paid to the employee unless

proper documentation from a medical professional is provided.
(Docket Entry # 52-2, p. 4).

Plaintiff filed for, and was granted, unemployment benefits
by the Massachusetts Division of Unemployment Assistance
("MDUA") following her termination. (Docket Entry # 45, ¶ 117).
The MDUA "found that Plaintiff's employment termination was
without good cause." (Docket Entry # 45 ¶ 117). "Plaintiff
lost her automatic health insurance payments" following her
termination from Dana-Farber, which required her to reschedule
several health care appointments. (Docket Entry # 45, ¶ 132).
Plaintiff currently suffers from severe emotional distress,
requiring professional care. (Docket Entry # 45, ¶ 136). After
plaintiff's termination, Dana-Farber "continued to hire new
staff and to promote other less qualified individuals, who were"
younger than plaintiff. (Docket Entry # 45, ¶ 119).

With respect to the Rule 12(b)(1) record only, in an
affidavit plaintiff states that her "disability had arisen as a
result of a workplace injury" she suffered. (Docket Entry # 56-
1, p. 1). Plaintiff further explains that she informed the EEOC
investigator during her interview of the facts relating to
Chammas and Sweeney's alteration of plaintiff's work duties to
include activities that would cause her greater pain. (Docket
Entry # 56-1, p. 1). Plaintiff further states in the affidavit

that Dana-Farber "offered no relief or accommodation" to address her disability.  (Docket Entry # 56-1, p. 1).

## DISCUSSION

Defendants seek dismissal of Count IV as to Chammas and Sweeney and Count VI as to Dana-Farber on the basis that both claims are barred by the exclusivity provision of the Massachusetts Worker's Compensation Act ("MWCA"), Massachusetts General Laws chapter 152, section 24, and therefore this court lacks subject-matter jurisdiction over the claims.  (Docket Entry # 51).  Plaintiff opposes dismissal, submitting that the claims are not barred by the exclusivity provision because the conduct giving rise to the torts did not occur within the course of her employment and in furtherance of the employer's interest.  (Docket Entry # 56, p. 4).

Separately, defendants move to dismiss counts I, X, XI and XIII as to Dana-Farber and Count VIII as to Chammas and Sweeney under Rule 12(b)(6) on the basis that the claims fail to suggest a "'plausible entitlement to relief'" as required by Bell Atl. Corp. v. Twombly, 550 U.S. at 559.  (Docket Entry # 51) (Docket Entry # 52, p. 2).  Plaintiff opposes dismissal.  (Docket Entry # 56).

## I.  Breach of Implied Covenant of Good Faith and Fair Dealing (Count I)

Defendants argue that the claim for breach of implied covenant of good faith and fair dealing is subject to dismissal because plaintiff makes no allegations that Dana-Farber terminated her to avoid paying her compensation for services already rendered.  (Docket Entry # 52, p. 10).  Plaintiff counters that Dana-Farber terminated her in bad faith and did not deal with her fairly throughout the course of employment thereby entitling her to recovery under the implied covenant of good faith and fair dealing.  (Docket Entry # 56, p. 3).

A covenant of good faith and fair dealing is implied in every contract, "'including contracts for employment at will.'" Saltzman v. Town of Hanson, 935 F.Supp.2d 328, 345 (D.Mass. 2013) (quoting Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 8 (1st Cir. 2011)).  The general rule, however, is that an at-will employee may be terminated at any time and for no particular reason.  See Artuso v. Vertex Pharm., Inc., 637 F.3d at 8 (Massachusetts law gives employer "'an unfettered right to discharge' an at will employee"); Folmsbee v. Tech Tool Grinding & Supply, Inc., 630 N.E.2d 586, 590 (Mass. 1994).  Liability nevertheless may be imposed on an employer if an at-will employee is terminated for a reason that clearly violates public policy.  See King v. Driscoll, 638 N.E.2d 488, 492 (Mass. 1994); Chacon v. Brigham and Women's Hosp., 99 F.Supp.3d 207, 217 (D.Mass. 2015); Santarpia v. Senior Residential Care/Kingston,

<u>Inc.</u>, 2014 WL 3891642, at *1 (Mass.App.Ct. Aug. 11, 2014). "The public policy exception makes redress available to employees who are terminated for asserting a legal right (e.g., filing a workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to disobey the law (e.g., refusing to commit perjury)." <u>Upton v. JWP Businessland</u>, 682 N.E.2d 1357, 1358 (Mass. 1997) (citing <u>Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.</u>, 533 N.E.2d 1368, 1370-71 (Mass. 1989)). The exception is narrowly interpreted because to do so otherwise would "convert the general rule . . . into a rule that requires just cause to terminate an at will employee." <u>Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.</u>, 533 N.E.2d at 1371; <u>Brunco v. Town of Dracut/Dracut Public Schs.</u>, 2009 WL 2176658, at *3 (Mass.App.Ct. July 23, 2009).

The covenant of good faith and fair dealing also allows for a limited exception to the employer's unfettered right by permitting a discharged employee to "recover 'unpaid compensation if the employee [was] terminated in bad faith and the compensation is clearly connected to work already performed.'" <u>Artuso v. Vertex Pharm., Inc.</u>, 637 F.3d at 8-9. Therefore, an employer breaches the implied covenant of good faith and fair dealing "when it dismisses an at will employee in order to deprive him of compensation fairly earned and

legitimately expected for services already rendered." Cochran
v. Quest Software, Inc., 328 F.3d 1, 8 (1st Cir. 2003).

The facts in the amended complaint do not identify or
reasonably infer that plaintiff was terminated in violation of
an established public policy.  The termination notice indicates
she was terminated as a result of "non-collaborative behavior
and insubordination."  (Docket Entry # 45, ¶ 108).  The facts
otherwise fail to plausibly assert that plaintiff's termination
falls within the limited public policy exception because she was
not terminated as a result of asserting a legal right, for doing
what the law requires, or for refusing to disobey what the law
prohibits.  Although plaintiff points out that the MDUA found
that the "termination was without good cause" (Docket Entry #
45, ¶ 117), plaintiff was an at-will employee and therefore
could be terminated at any point without cause.

The facts in the amended complaint also fail to indicate
plaintiff was owed wages for past work at the time of her
termination.  At the time of termination, plaintiff was paid on
an hourly basis.  (Docket Entry # 45, ¶ 114).  She was not
entitled to additional hourly wage payments for already
performed services or payments for already earned bonuses or
earned commissions.  Indeed, there are no facts plausibly
suggesting that Dana-Farber terminated plaintiff to avoid
payment of rightfully earned compensation for past work.  Count

I is therefore subject to a Rule 12(b)(6) dismissal as to Dana-Farber.

## II.   Intentional and Negligent Infliction of Emotional Distress

Defendants move to dismiss counts IV and VI for lack of subject-matter jurisdiction under Rule 12(b)(1). They submit that the intentional infliction of emotional distress claim against Chammas and Sweeney in Count IV and the negligent infliction of emotional distress claim against Dana-Farber are subject to a Rule 12(b)(1) dismissal because the exclusivity provision of the MWCA bars both of the claims.

Under the exclusivity provision of the MWCA, an employee is considered to have waived his right to bring an action against an employer with respect to a personal injury compensable under the status unless the employee gave notice to the employer at the time of hire that he intends to claim such right. See Mass. Gen. Laws ch. 152, § 24. Actions are barred by the exclusivity provision if the plaintiff is an employee, his condition is a personal injury within the meaning of the statute and the injury arose out of and in the course of employment. See O'Connor v. Jordan Hosp., 2012 WL 1802308, at *11 (D.Mass. May 16, 2012); Britton v. Athenahealth, Inc., 2013 WL 2181654, at *4 (Mass.Super.Ct. May 3, 2013).

In fact, Massachusetts courts interpret the exclusivity provision in the statute as "abrogat[ing] subject matter

jurisdiction in applicable cases." Branyan v. Southwest
Airlines Co., 105 F.Supp.3d 120, 125 (D.Mass. 2015) (citing
Fusaro v. Blakely, 661 N.E.2d 1339, 1341 (Mass.App.Ct. 1996),
and dismissing intentional and negligent infliction of emotional
distress claims under Rule 12(b)(6)).

That said, the procedural rule defendants invoke, Rule
12(b)(1), to dismiss the two state law claims under the
exclusivity bar applies to the subject-matter jurisdiction of
this court.  A Rule 12(b)(1) motion "'raises the fundamental
question whether the federal district court has subject matter
jurisdiction over the action before it.'"  United States v.
Lahey Clinic Hosp., Inc., 399 F.3d 1, 8 n.6 (1st Cir. 2005).
More broadly, subject-matter jurisdiction delineates the class
of cases over which this court has adjudicatory authority.  See
AngioDynamics, Inc. v. Biolitec AG, 823 F.3d 1, 6 (1st Cir. 2016)
("'[j]urisdiction' refers to 'a court's adjudicatory authority'"
and "term 'jurisdictional' properly applies only to
'prescriptions delineating the classes of cases (subject-matter
jurisdiction) and the persons (personal jurisdiction)'
implicating that authority") (quoting Reed Elsevier, Inc. v.
Muchnick, 559 U.S. 154, 160-61 (2010)).

Although the scope of a Rule 12(b)(1) motion is
sufficiently flexible to encompass "a variety of challenges to
the court's power to hear the case," United States v. Lahey

Clinic Hosp., Inc., 399 F.3d at 8 n.6, defendants utilize the rule as a means to dismiss a state law claim even though federal question jurisdiction exists and this court's supplemental jurisdiction ordinarily extends to related state law claims involving "the same nucleus of operative facts." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996); see 28 U.S.C. § 1367(a). The Seventh Circuit in Goetzke v. Ferro Corp., 280 F.3d 766 (7th Cir. 2002), rejected a similar argument, to wit, "that a statutory provision contained in Indiana's worker's compensation scheme deprives federal as well as state courts of jurisdiction over Mr. Goetzke's tortious interference claim." Id. at 778; accord Jarrard v. CDI Telecomm., Inc., 408 F.3d 905, 909 n.3 (7th Cir. 2005) (lower court properly construed Rule 12(b)(1) motion attacking state exclusivity provision on basis of lack of subject-matter jurisdiction as Rule 12(b)(6) motion); Harvard v. Perdue Farms, Inc., 403 F.Supp.2d 462, 463 (D.Md. 2005) (rejecting argument that "a 'statutory employer' defense under the Virginia Act may be asserted as an attack on a federal district court's subject matter jurisdiction" under Rule 12(b)(1) and treating the motion as one for summary judgment). As aptly explained in Goetzke:

> It is not correct to say, as Crawford suggests, that the
> Indiana legislature has deprived the federal courts of
> subject matter jurisdiction over this matter. "The
> jurisdiction of the federal courts-their power to
> adjudicate-is a grant of authority to them by Congress."

> Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165,
> 167, 60 S.Ct. 153, 84 L.Ed. 167 (1939). Once Congress has
> conferred subject matter jurisdiction on the federal
> courts, state law cannot expand or contract that grant of
> authority [internal citations omitted]. In this case, the
> federal diversity statute, 28 U.S.C. § 1332, conferred
> subject matter jurisdiction on the district court to
> adjudicate Mr. Goetzke's claims—including his allegations
> of tortious interference. The exclusivity provision of
> Indiana's worker's compensation statute does nothing to
> affect that grant of jurisdictional authority.

Goetzke v. Ferro Corp., 280 F.3d at 778-79 (citations omitted).

The court then continued to explain that, "Whether there remains a viable cause of action is a *separate* question" and if the state substantive law denies the plaintiff a remedy, then a dismissal "for *failure to state a claim upon which relief* may be granted" is required. Id. at 779 (emphasis added).

Furthermore, the distinction between employing Rule 12(b)(1) and not Rule 12(b)(6) "is not . . . of interest only to procedure buffs. Rather, this distinction affects how disputed facts are handled, and it determines when a party may raise the point." Minn-Chem, Inc. v. Agrium, Inc., 683 F.3d 845, 852-53 (7th Cir. 2012); see De La Cruz v. Irizarry, 946 F.Supp.2d 244, 249 (D.P.R. 2013) ("'[d]ifferent consequences flow from dismissals under 12(b)(1) and 12(b)(6): for example, dismissal under the former, not being on the merits, is without res judicata effect'"). A Rule 12(b)(1) motion "determines whether the plaintiff has a right to be in the particular court" whereas a Rule 12(b)(6) motion presents "an adjudication as to whether a

24

cognizable legal claim has been stated."  5B Charles Allan

Wright et al., Federal Practice and Procedure, § 1350 (3rd ed.

2016).

In sum, defendants' motion to dismiss the intentional and

negligent infliction of emotional distress claims because of a

lack of federal subject-matter jurisdiction under Rule 12(b)(1)

is not well taken.  Although other procedural avenues *may* remain

available, see Fed.R.Civ.P. 12(c), 56, this court expresses no

opinion on their procedural or substantive merits.

III.  Age Discrimination – Chapter 151B (Count VIII)

Defendants argue that plaintiff's claim for age

discrimination against Chammas and Sweeney under chapter 151B

should be dismissed because they were not named as respondents

in plaintiff's charge of discrimination filed with the EEOC.

(Docket Entry # 52, p. 11).  Plaintiff argues that the EEOC

investigator filled out her discrimination complaint and

therefore she should still be entitled to move forward with her

claim against Chammas and Sweeney.[4]  (Docket Entry # 56, p. 6).

Before filing a chapter 151B claim, a plaintiff must file

with the MCAD "a verified complaint in writing which shall state

the name and address of the person, employer, labor organization

or employment agency alleged to have committed the unlawful

---

[4]  Defendants seek dismissal under Rule 12(b)(6) and plaintiff's
affidavit is not part of the Rule 12(b)(6) record.

practice complained of . . .." Mass. Gen. Laws ch. 151B, § 5.
Claims filed with the MCAD or EEOC are effectively filed with
both agencies due to the work-sharing agreement between
agencies. See Williams v. City of Brockton, 59 F.Supp.3d at
246. The purpose of filing with the MCAD prior to filing a
civil claim is "'(1) to provide the MCAD with an opportunity to
investigate and conciliate the claim of discrimination; and (2)
to provide notice to the defendant of potential liability.'"
Everett v. 357 Corp., 904 N.E.2d 733, 746 (Mass. 2009) (citing
Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 936
(Mass. 2001)). Therefore, a plaintiff generally cannot identify
additional defendants in a subsequent civil action if the
defendants were not previously named as respondents in the MCAD
charge. Powers v. H.B. Smith Co., Inc., 679 N.E.2d 252, 258-59
(Mass. 1997) (claim against defendant barred where plaintiff
knew defendant's identity at time of MCAD filing, failed to name
defendant as respondent in MCAD charge, and did not move to
amend charge to assert claim against defendant); King v. First,
705 N.E.2d 1172, 1173-74 (Mass.App.Ct. 1999) (barring claims
against defendant not previously named as a respondent in MCAD
charge).

There are, however exceptions to "the general rule that a
party who is not named as a respondent in an administrative
charge before the Equal Employment Opportunity Commission . . .

is not subject to a subsequent civil action." King, 705 N.E.2d at 1173 (identifying exceptions and other considerations). For example, in Chatman v. Gentle Dental Center of Waltham, 973 F.Supp. 228 (D.Mass. 1997), the individual defendants moved to dismiss the plaintiff's chapter 151B claim against them on the grounds that they were not named as respondents in an MCAD charge. Id. at 233. The court in Chatman analyzed the applicability of a case decided by the Massachusetts Supreme Judicial Court ("SJC"), Brunson v. Wall, 541 N.E.2d 338, 341 (Mass. 1989). The SJC in Brunson noted that, "[w]hile the individual defendants were not named parties in the MCAD proceeding, their conduct was at issue." Brunson, 541 N.E.2d at 341. Applying Brunson, the court in Chatman explained that, "whether a party has been appropriately identified as a wrongdoer in a charge filed with the MCAD so as to support a subsequent civil action against that party is a matter to be determined from a reading of the charge as a whole." Chatman, 973 F.Supp. at 234. As "long as the individual is identified sufficiently in the MCAD charge regarding that individual's conduct, and if the individual was put on notice of the charge and had an opportunity to conciliate, the individual may be included as a defendant in a later civil suit alleging Chapter 151B violations." Aung v. Ctr. for Health Info. and Analysis, 2016 WL 884878, at *2 (D.Mass. March 8, 2016); accord Chatman v.

<u>Gentle Dental Center of Waltham</u>, 973 F.Supp. at 235 (concluding that SJC "would hold that failure to name a party as a respondent in a charge filed with the MCAD does not preclude a later civil action against that party if the conduct of the party was put in issue by the charge and the party had notice of and an opportunity to conciliate the charge").

Here, the EEOC charge cross-filed with the MCAD checked the applicable box for age discrimination. It also named Dana-Farber as the respondent in the box that instructed, "Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below)." (Docket Entry # 52-1). The body of the charge is replete with facts of alleged misconduct by Chammas. To a lesser extent, the charge identifies Sweeney's misconduct. (Docket Entry # 52-1).

Similar to <u>Chatman</u>, plaintiff did not name Chammas and Sweeney as respondents in the MCAD complaint, but referenced the misconduct of Chammas and Sweeney. The conduct of Chammas and Sweeney was put at issue in the administrative charge and, drawing reasonable inferences from the amended complaint, it is likely that they had notice of and an opportunity to conciliate the charge. Accordingly, the chapter 151B age discrimination

28

claim in Count VIII against Chammas and Sweeney is not subject
to a Rule 12(b)(6) dismissal.

IV.  Retaliation (Count X)

Defendants next argue that the Title VII claim for
retaliation against Chammas and Sweeney should be dismissed
because plaintiff's proposed amended complaint, which the court
allowed subject to *omitting* causes of action after reviewing
defendants' opposition (Docket Entry # 44), did not include a
Title VII cause of action for retaliation.  (Docket Entry # 52,
p. 14).  Plaintiff contends that she merely recast the claim
from the original complaint "as it should have been cast
originally."  (Docket Entry # 56, p. 7).  Plaintiff further
asserts that she acted in good faith and "sought to comply with
the Court's order."  (Docket Entry # 56, p. 7).

The June 7, 2016 Order unequivocally stated, "Plaintiff's
motion is ALLOWED" and that, "Before filing, Plaintiff may omit
from her proposed amended complaint any causes of action (in
their entirety or as to particular Defendants) that Plaintiff no
longer seeks to assert after careful review of Defendants'
opposition to the motion to amend."  (Docket Entry # 44).  In
the amended complaint plaintiff filed after the Order, she
omitted a cause of action under the Massachusetts Whistleblowers
Act, Massachusetts General Laws chapter 149, section 185
("section 185"), presumably after a careful review of

defendants' opposition. The opposition pointed out, correctly, that private hospitals, such as Boston's Children's Hospital, are not public "employers" within the meaning of section 185 and, accordingly, are not subject to liability under the statute. (Docket Entry # 43, pp. 11-12) (citing Cabi v. Boston Children's Hosp., 161 F.Supp.3d 136, 158 (D.Mass. 2016) (section 185 "creates a cause of action for public employees who are retaliated against for disclosing an unlawful activity, policy or practice of a state government employer")). In its place, plaintiff unilaterally added the Title VII retaliation claim in Count X against Sweeney and Chammas.

Where, as here, a court "order is clear and unambiguous" on its face, a court must adopt and enforce the order in accordance with the order's plain meaning. Negrón-Almeda v. Santiago, 528 F.3d 15, 23 (1st Cir. 2008) ("when a court's order is clear and unambiguous, neither a party nor a reviewing court can disregard its plain language"). The plain meaning of the Order allowed the amendment in its proposed form and also allowed plaintiff to omit, not insert, a new cause of action after reviewing defendants' opposition.

Plaintiff's argument that the facts in the amended complaint include allegations of discriminatory conduct does not allow plaintiff to ignore the plain terms of the June 7, 2016 Order. That Order allowed amendment only for the causes of

action in the proposed amended complaint, all of which are labeled in separate counts and headings under Roman numeral III entitled "CLAIMS." (Docket Entry # 38, p. 16).

Because the Order granting the motion to amend did not allow plaintiff to insert a new cause of action, it was incumbent upon plaintiff to seek and obtain leave of court before adding the new Title VII cause of action for retaliation against Sweeney and Chammas. See Fed.R.Civ.P. 15(a)(2). The Title VII retaliation claim is therefore subject to dismissal because it is outside the scope of the June 7, 2016 Order and plaintiff did not otherwise seek and obtain leave to amend the complaint to include it. Count X is therefore subject to dismissal, albeit without prejudice.

## V.  Violation of MWA (Count XI)

Count XI seeks to recover the sick leave plaintiff had accrued at the time of her termination under the MWA. Defendants contend that Count XI for violation of the MWA should be dismissed because sick leave is not included within the term "wages" that an employee is entitled to upon termination under the statute. (Docket Entry # 52, p. 15). Plaintiff counters that sick leave must be earned under Dana-Farber's Sick Leave Policy and therefore any unused benefits should be considered "wages" under the MWA. (Docket Entry # 56, pp. 8-10).

As noted in the factual background, regular and part-time staff members working at least 20 hours a week "are eligible for paid sick leave." (Docket Entry # 52-2). The Sick Leave Policy expressly prohibits the payout of sick time when a staff member is terminated or otherwise leaves the employment of Dana-Farber. The relevant provision states, "Payout of Sick Time:  Unused sick time is not paid as a terminating benefit when a staff member leaves the employment of" Dana-Farber. (Docket Entry # 52-2). Under the policy, sick time hours are also "not considered hours of work for overtime calculations." (Docket Entry # 52-2). As a result, the policy does not create any contractual obligation to pay a terminated employee "wages" equivalent to the amount of unused sick time at the date of termination.

Under the MWA, an "employee has a private cause of action to recover 'wages' wrongfully withheld or detained by the employer." Fraelick v. PerkettPR, Inc., 989 N.E.2d 517, 522 (Mass.App.Ct. 2013); Mass. Gen. Laws ch. 149, §§ 148, 150. The MWA defines "wages" to include "any holiday or vacation payments due an employee *under oral or written agreement*." Mass. Gen. Laws ch. 149, § 148 (emphasis added). The purpose of the statute "is to 'prevent the unreasonable detention of wages.'" Comley v. Media Planning Group, 108 F.Supp.3d 6, 10 (D.Mass.

2015) (quoting <u>Boston Police Patrolmen's Ass'n v. Boston</u>, 761

N.E.2d 479, 481 (Mass. 2002)).

The "[h]oliday or vacation payments" language does not

expressly include "sick leave" payments.  Mass. Gen. Laws ch.

149, § 148.  A number of courts, however, analogize sick leave

to "holiday or vacation" pay thereby requiring "an oral or

written agreement" within the meaning of section 148 in order to

allow sick leave payments to a terminated employee.  As

summarized in <u>Tze-Kit Mui v. Mass. Port Auth.</u>, 2015 WL 1842635,

at *3 (Mass.Super. April 1, 2015):

> various decisions applying § 148 have expressly likened
> sick leave to vacation and holiday pay, treating all three
> as "wage equivalents" but without conducting further
> analysis.  *See*, *e.g.*, *Dennis v. Jager, Smith & Stetler,*
> *P.C.*, 11 Mass. L. Rep. 567, 2000 LEXIS 114, at *2, 2000 WL
> 782946 (Mass.Super. 2000) (Ball, J.) ("wages . . . include
> assured compensation and compensation equivalents such as
> accrued vacation pay and sick leave"); *Scalli v. Citizens*
> *Fin. Group, Inc.*, 2006 LEXIS 7717, at *38, 2006 WL 1581625
> (D.Mass. 2006) (Woodlock, J.) ("[T]he Wage Act only ensures
> the payment of ordinary wages and wage equivalents, like
> specifically accrued vacation pay and sick leave . . ..").

<u>Tze-Kit Mui v. Massachusetts Port Auth.</u>, 2015 WL 1842635,

at *3.  A number of other courts suggest:

> that unused sick time may constitute compensable wages due
> upon termination of employment only if so provided for in
> an explicit agreement.  *See*, *e.g.*, *Schiavone v. Lawrence*,
> 2013 WL 9925566, at *2 (Mass.Super. 2013) (Feeley, J.)
> ("Although it may not be entirely clear, it appears that
> courts find sick and personal time to be within the scope
> of the Wage Act only when based upon an express agreement
> by the employer."); *Souto v. Sovereign Realty Assocs.*, 23
> Mass. L. Rep. 386, 2007 LEXIS 550, at *10, 2007 WL 4708921
> (Mass.Super.2007) (Fremont-Smith, J.) (stating that

33

plaintiff "is not entitled to recover compensation for
personal and sick time under this statute [§ 148] absent
express agreement"); *Dickens-Berry v. Greenery
Rehabilitation & Skilled Nursing Ctr.*, 1993 LEXIS 57, at *8
n. 4, 1993 WL 818564 (Mass.Super. 1993) (Botsford, J.)
("Sick leave is not considered to be 'wages' to which an
employee is entitled upon termination absent an express
agreement by the employer"). *See also Roche v. Morgan
Collection, Inc.*, 882 F.Supp.2d 247, 256 (D.Mass. 2012)
(Neiman, USMJ) (after recognizing that "there is some
ambiguity in the relevant case law as to whether
compensation for unused personal and sick time is
recoverable under the Wage Act absent express agreement,"
the Court concluded that because plaintiff had alleged that
her employment agreement specifically contemplated payout
of unused sick leave at the time of termination, her sick
leave benefits were "more akin to assured non-discretionary
compensation which may properly be considered a wage under
the Act").

Id. at *4.

In the case at bar, Dana-Farber's Sick Leave Policy

unequivocally denied payment of unused sick leave to an employee

leaving the company. (Docket Entry # 52-2). Plaintiff also

lacked a contract or other express agreement dictating the

payment of unused sick leave upon termination of employment.

Thus, there is neither an "explicit agreement" for Dana-Farber

to pay a departing employee the equivalent of unused sick time

under the latter group of cases nor, treating sick leave as

equivalent to holiday and vacation payments, "an oral or written

agreement" for holiday or vacation payments within the meaning

of section 148.[5]  Without either a policy or contractual

_____

[5]  The enactment of section 148C(7) in chapter 149, captioned
"Earned Sick Time" and effective July 1, 2015, post dates the

agreement to pay plaintiff unused, accrued sick time at the time
of her termination, she is not entitled to recover under the
MWA.

A similar result occurs when applying the five principles
outlined in Tze, relied upon by plaintiff, to determine if a
benefit constitutes "wages" within the meaning of section 148.
See Tze-Kit Mui v. Mass. Port Auth., 2015 WL 1842635, at *5.
The fifth principle is that the benefit "is subject to an
express obligation to pay upon termination of employment-unless
the statute otherwise provides." Id. Dana-Farber did not have
"an express obligation to pay" a terminated employee unused sick
leave. To the contrary, the hospital's Sick Leave Policy
expressly states it had no such obligation. In short, the facts
and reasonable inferences in the amended complaint fail to
plausibly suggest that earned sick time constitutes wages or is
otherwise a compensable benefit at termination under the MWA.
Plaintiff's generalized "public policy" argument fails to
convince this court otherwise. Accordingly, Count XI is subject
to a Rule 12(b)(6) dismissal.

VI.  ADA Violation (Count XIII)

Defendants next argue that the ADA claim (Count XIII)
against Dana-Farber should be dismissed because plaintiff failed

---

January 2014 termination of plaintiff. See Mass. Gen. Laws ch.
149, § 148C(7).

to file an administrative claim within 300 days of the alleged act of discrimination based on a disability.  (Docket Entry # 52, pp. 17-19).  Plaintiff opposes dismissal, stating that the EEOC investigator improperly transcribed her complaint.  (Docket Entry # 56, p. 10).

"The scope of the civil complaint is . . . limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge."  Luciano v. Coca-Cola Enters., Inc., 307 F.Supp.2d 308, 323 (D.Mass. 2004) (citing Powers v. Grinnell Corp., 915 F.2d 34, 38 (1st Cir. 1990)); see also Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005) ("complaint must bear some close relation to the allegations presented to the agency").  Further, the purpose of the charge is to initiate an EEOC investigation rather than "'state sufficient facts to make out a prima facie case.'"  Powers v. Grinnell Corp., 915 F.2d at 38-39 (citation omitted); accord Fantini v. Salem State Coll., 557 F.3d 22, 27 (1st Cir. 2009).  Although the administrative charge is not an exact plan for the succeeding civil action, "plaintiffs cannot piggyback entirely new claims onto a subsequent civil case."  Valle-Arce v. P.R. Ports Authority, 632 F.Supp.2d 138, 140 (D.P.R. 2009) (citing Fantini v. Salem State Coll., 557 F.3d 22, 22 (1st Cir. 2009)).

The ADA requires a plaintiff alleging discrimination

against an employer to comply with the administrative procedures set forth in Title VII.  <u>See</u> 42 U.S.C. § 12117.  As explained in <u>Bonilla</u>:

> [T]he ADA mandates compliance with the administrative procedures specified in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and that, absent special circumstances (not present here), such compliance must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA.

<u>Bonilla v. Muebles J.J. Alvarez, Inc.</u>, 194 F.3d 275, 277 (1st Cir. 1999).  It is well settled that:

> [I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred.

42 U.S.C. § 2000e-5(e)(1).  Therefore, a plaintiff must file a complaint with the MCAD within 300 days of the occurrence of the alleged discriminatory actions.  <u>Hall v. FMR Corp.</u>, 559 F.Supp.2d 120, 124 (D.Mass. 2008).  The failure to file a charge with the MCAD within 300 days "requires the dismissal of any subsequent lawsuit."  <u>Id</u>.  The disability alleged in the amended complaint arose from a workplace injury plaintiff experienced in December 2013.  (Docket Entry # 45, ¶ 125).

Like chapter 151B, the purpose of the administrative filing requirement under Title VII is to provide employers with prompt

notice of the charges and to allow employers facing discrimination the chance for early conciliation.  <u>Hall</u>, 559 F.Supp.2d at 124.  Therefore, "[t]hat purpose would be frustrated if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action." <u>Lattimore v. Polaroid Corp.</u>, 99 F.3d 456, 464 (1st Cir. 1996).  In employment discrimination cases, "'[t]he scope of the civil complaint is . . . limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge.'" <u>Powers v. Grinnell Corp.</u>, 915 F.2d at 38.

In this case, plaintiff failed to identify discrimination based upon her disability within the discrimination charge filed with the EEOC.  Plaintiff identifies discrimination based upon her age and national origin, but fails to identify discrimination based upon a disability in the EEOC complaint. Even liberally construing the pro se EEOC charge, the charge does not refer to any disability or the December 2013 workplace injury that forms the basis of the ADA claim (Docket Entry # 45, ¶¶ 125-127, 190) in Count XIII.  Plaintiff failed in her administrative filing with the EEOC to properly assert the essential facts required to assert a disability claim.  In doing so, Dana-Farber was deprived of prompt notice of the disability discrimination charge and the opportunity for early

conciliation.  Plaintiff did not assert a claim for discrimination based upon disability within 300 days of the alleged discriminatory events.  Allowing the claim to move forward would frustrate the purpose of the statute as it was written.  In light of the foregoing, Dana-Farber is entitled to dismissal of Count XIII for a violation of the ADA.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[6] that defendants motion to dismiss (Docket Entry # 51) be **ALLOWED** as to Counts I, X, XI and XIII[7] and **DENIED** as to Counts IV, VI and VIII.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[6] Any objection to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included.  See Fed.R.Civ.P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.

[7] See footnote one.