UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUADA MEHIC,
     Plaintiff,

     v.                                   CIVIL ACTION
                                       15-12934-IT

DANA-FARBER CANCER INSTITUTE, INC.,
MELISSA CHAMMAS and LINDA SWEENEY,
     Defendants.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS DANA-FARBER CANCER INSTITUTE, INC., MELISSA CHAMMAS,**
**AND LINDA SWEENEY'S MOTIONS FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY ## 99, 101)**

**August 31, 2018**

**BOWLER, U.S.M.J.**

Pending before this court are motions for summary judgment
filed by defendants Dana-Farber Cancer Institute, Inc. ("Dana-
Farber"), Melissa Chammas ("Chammas") and Linda Sweeney
("Sweeney") (collectively "defendants") under Fed. R. Civ. P. 56
("Rule 56"). (Docket Entry ## 99, 101). Plaintiff Suada Mehic
("plaintiff") opposes the motions. (Docket Entry # 108). After
conducting a hearing, this court took the motions under
advisement. (Docket Entry # 124).

PROCEDURAL BACKGROUND

On June 27, 2016, plaintiff filed a first amended complaint
("the amended complaint") against defendants. (Docket Entry #
45). The amended complaint sets out the following claims: (1)

breach of the implied covenant of good faith and fair dealing against Dana-Farber (Count I); (2) unjust enrichment against Dana-Farber (Count II); (3) tortious interference with contractual relations against Chammas and Sweeney (Count III); (4) intentional infliction of emotional distress ("IIED") against Chammas and Sweeney (Count IV); (5) libel and slander against Chammas and Sweeney (Count V); (6) negligent supervision against Dana-Farber (Count VI); (7) age discrimination under the Age Discrimination in Employment Act of 1967 ("AEDA"), 29 U.S.C. §§ 621 et seq., against Dana-Farber (Count VII); (8) age discrimination under Massachusetts General Laws chapter 151B ("chapter 151B") against defendants (Count VIII); (9) discrimination based on national origin under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 et seq., against Dana-Farber (Count IX); (10) a retaliation claim against Chammas and Sweeney under Title VII (Count X); (11) a violation of the Massachusetts Wage Act under Massachusetts General Laws chapter 149, section 148, against defendants (Count XI); (12) a violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2061 et seq., against Dana-Farber (Count XII); and (13) a violation of the American with Disabilities Act

("ADA"), 42 U.S.C. §§ 1210 et seq., against Dana-Farber (Count XIII).[1]  (Docket Entry # 45).

Defendants moved to dismiss counts IV and VI for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) ("Rule 12(b)(1)").  (Docket Entry # 51).  They also sought to dismiss counts I, VIII (as to Chammas and Sweeney only), X, XI and XIII for failure to state a claim under Fed. R. Civ. P. Rule 12(b)(6).  (Docket Entry # 51).

On January 25, 2017, this court issued a Report and Recommendation on the partial motion to dismiss.  (Docket Entry # 77).  By adopting the Report and Recommendation, the court dismissed counts I, X, XI and XIII and denied the motion to dismiss counts IV, VI, VIII.  (Docket Entry # 77).  Defendants move for summary judgment on counts III, IV, V, VI, VII, VIII, IX and XII under Rule 56.[2]

STANDARD OF REVIEW

---

[1]  The amended complaint contains two separate counts, both denoted as "Count XII."  (Docket Entry # 45).  To distinguish the counts, this court continues to adopt the approach taken in a prior Report and Recommendation (Docket Entry # 77) and refers to the ADA count, denoted originally as Count XII, as Count XIII.

[2]  Defendants state they are moving for summary judgment on "all remaining claims," but fail to include Count II, unjust enrichment against Dana-Farber, in the list of remaining claims or address it in their supporting memorandum.  Therefore, Count II remains in this action.

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007) (citations and internal quotation marks omitted).  It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Id.

Facts are viewed in favor of the non-movant, i.e., plaintiff.  Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).  "Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case is not significantly probative, summary judgment may be granted."  Davila, 498 F.3d at 12 (internal quotation marks, citations, and ellipses omitted); accord Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (if moving party makes

4

preliminary showing, nonmoving party must "produce specific
facts, in suitable evidentiary form, to establish the presence
of a trialworthy issue" with respect to each element on which he
or she "would bear the burden of proof at trial") (internal
quotation marks and citations omitted).

Defendants submit a LR. 56.1 statement of undisputed facts.
Uncontroverted statements of fact in the LR. 56.1 statement
comprise part of the summary judgment record.  See Cochran v.
Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the
plaintiff's failure to contest date in LR. 56.1 statement of
material facts caused date to be admitted on summary judgment);
Stonkus v. City of Brockton School Department, 322 F.3d 97, 102
(1st Cir. 2003).  A non-moving party therefore admits any fact
in the moving party's LR. 56.1 statement if the non-moving party
fails to controvert the fact in the non-moving party's LR. 56.1
statement.  See LR. 56.1.

As a final matter, plaintiff verifies and affirms, "under
the pains and penalties of perjury," the truth of the
allegations in the amended complaint.  (Docket Entry # 110, ¶
114).  Although she also states that her supplemental answers to
interrogatories supplement and correct unspecified allegations
in the amended complaint (Docket Entry # 110, ¶ 114), the
statement that she verifies the allegations under the pains and
penalties of perjury serves as the equivalent of an affidavit

for summary judgment.  Sheinkopf v. Stone, 927 F.2d 1259, 1262-1263 (1st Cir. 1991); accord Smith v. Massachusetts Dept. of Correction, 936 F.2d 1390, 1394 (1st Cir. 1991); see Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 689 (1st Cir. 1993) (discussing 28 U.S.C. § 1746); Uncle Henry's Inc. v. Plaut Consulting, Inc., 240 F. Supp. 2d 63, 69 (D. Me. 2003) ("[a]ffidavits need not be notarized to be cognizable on summary judgment so long as they are made under penalties of perjury in accordance with 28 U.S.C. § 1746"); Piggot v. Dennehy, Civil Action No. 05-10702-NG, 2008 WL 2246652, at *1 (D. Mass. May 29, 2008) (because "complaint is signed under penalty of perjury, . . ., Court will treat it as an affidavit for purposes of summary judgment") (citing 28 U.S.C. § 1746).  Accordingly, *factual* statements in the verified amended "complaint, to the extent demonstrated to come within [plaintiff's] personal knowledge, [are] fully tantamount to a counter-affidavit, and hence, worthy of consideration" on summary judgment.[3]  Sheinkopf v. Stone, 927 F.2d at 1262-63.

A companion opinion adjudicates a motion to strike plaintiff's affidavit and associated filings, including a supplemental affidavit by plaintiff.  The opinion is

---

[3]  This court primarily identifies the amended complaint (Docket Entry # 45) by the docket entry of the copy of the amended complaint (Docket Entry # 110-1), which plaintiff references in the verification in her affidavit (Docket Entry # 110, ¶ 114).

incorporated herein by reference.  The summary judgment record, construed in plaintiff's favor, is as follows.  Disputes, where applicable, are noted.

FACTUAL BACKGROUND

Plaintiff was born in 1957 in "Brcko, Sarajevo, Bosnia and Herzegovina."  (Docket Entry # 103, ¶ 7) (Docket Entry # 109, ¶ 7).  Plaintiff was raised in Bosnia and speaks English with an accent.  (Docket Entry # 110-1, ¶ 11).  At the time she filed the amended complaint on June 27, 2016, she was 58 years old.  (Docket Entry 110-1, ¶ 7).

On August 11, 2003, plaintiff was hired as a cashier by Dana-Farber.  (Docket Entry # 103, ¶ 8) (Docket Entry # 109, ¶ 8).  Plaintiff was an at-will employee.  (Docket Entry # 103, ¶ 8) (Docket Entry # 109, ¶ 8).  The cashier position is part of general accounting and the cashier's booth is located at Dana-Farber Cancer Institute's main campus at 450 Brookline Avenue ("DFCI").  (Docket Entry # 103, ¶ 3) (Docket Entry # 109, ¶ 3).  The General Accounting Department is located at 10 Brookline Place ("10BP").  (Docket Entry # 103, ¶¶ 1, 3) (Docket Entry # 109, ¶¶ 1, 3).  During plaintiff's employment, a cashier's duties included, but were not limited to, "running the cashier's booth in the hospital lobby, performing other various general accounting tasks, and working directly with both hospital staff and patients on a daily basis on accounting issues."  (Docket

7

Entry # 110-1, ¶ 12).  Plaintiff's responsibilities "expanded greatly from the time she was hired to the time her employment was terminated."  (Docket Entry # 110, ¶ 3).

Plaintiff was trained by Sweeney and Tara Hershberger ("Hershberger"), who were close friends, when plaintiff began her employment.  (Docket Entry # 110-1, ¶¶ 17-18).  On or around May 8, 2006, plaintiff discovered and reported to her supervisors that Hershberger was stealing money from Dana-Farber by taking the cash intended for T-passes rather than depositing it in the bank.  (Docket Entry # 110-1, ¶ 19); see (Docket Entry # 110-9).[4]  Hershberger's employment was terminated shortly thereafter.  (Docket Entry # 110-1, ¶ 20).

Sweeney started working at Dana-Farber on April 24, 2000 as an accounts receivable coordinator in general accounting.  (Docket Entry # 96, ¶ 3).  Sweeney was born in Montserrat and immigrated to the United States.  (Docket Entry # 103, ¶ 6)

---

[4]  The above docket entry includes an email dated May 8, 2006 from Christine Conroy ("Conroy"), a Dana-Farber employee, which states, "[d]uring this audit it has come to my attention that there are certain transactions that pass through the cashier's booth that are not being wrung into the register."  (Docket Entry # 110-9).  It also includes an email dated May 9, 2006 where plaintiff indicated she could not handover a copy of the record where she wrote down the transactions related to T-passes because "Tara told me if somebody need[ed] copy she has all of them."  (Docket Entry # 110-9).  To the extent these emails contain hearsay statements, they are not used for the truth of the matter, but rather to establish around what date the incident with Hershberger took place, as it is unclear.  (Docket Entry # 110-9).

(Docket Entry # 109, ¶ 6).  She transferred to the role of senior financial accountant in general accounting on July 28, 2000.  (Docket Entry # 96, ¶ 3).  At an undisclosed time, Sweeney accused plaintiff of stealing money from a patient, which was later resolved by the patient's admission that it was "their problem."  (Docket Entry # 110-1, ¶ 22).

In 2006, Beth Dean ("Dean"), the human resources generalist assigned to the finance department, informed plaintiff that she could apply for a staff accountant position that was open in general accounting.  (Docket Entry # 98-1, pp. 7-8).  Plaintiff informed Dean that she would not like to apply for the position. (Docket Entry # 98-1, pp. 7-8).  Later, however, plaintiff asked Dean "to find anything."  (Docket Entry # 110, ¶ 5).

Chammas began working at Dana-Farber on September 8, 2008. (Docket Entry # 103, ¶ 12) (Docket Entry # 109, ¶ 12).  On September 15, 2008, plaintiff received her yearly performance evaluation.  (Docket Entry # 110-16).  Plaintiff wrote on her performance evaluation that her pay grade of 12 did not reflect her work, responsibility, education, and long experience. (Docket Entry # 110-16).  She also emailed Conroy on September 15, 2008, asking for something to be done about her pay. (Docket Entry # 110-16).  By email, Conroy informed plaintiff that any increase had to be done through Chammas.  (Docket Entry # 110-16).  On September 23, 2010, plaintiff sent Chammas an

9

email asking if there was any progress regarding her grade.
(Docket Entry # 110-16).

   At the beginning of 2011, a large promotion of staff
occurred.  (Docket Entry # 110, ¶ 13).  Plaintiff was the only
employee left without a promotion.  (Docket Entry # 110, ¶ 13).
After speaking with Chammas about the lack of a promotion,
plaintiff informed Joe Barberio ("Barberio") that she was "very
offended when Chammas spoke to [her] about the issue of [her]
promotion that day."  (Docket Entry # 110, ¶ 13).  Plaintiff
also told Barberio, "I did not deserve it after so many years of
good job and that [she] did not come out of the street that
[Chammas] is talking to me like that."  (Docket Entry # 110, ¶
13).  At an undisclosed time, plaintiff was informed by Chammas
and Barberio to just continue doing work in her current position
with no need to formally apply for more senior roles.[5]  (Docket
Entry # 110-1, ¶ 34).  Plaintiff wished to apply to more senior
roles open in the finance department but Chammas and Barberio
always told plaintiff that they wanted her at her current role.[6]
(Docket Entry # 110-1, ¶ 37).  Defendants continued to state

---

[5]  Statements by Chammas and Barberio are not admitted for the
truth of the matter, but for the effect on the listener, namely,
that plaintiff did not think she had to apply for other
positions.
[6]  See the previous footnote.

that plaintiff's wages and salary would be adjusted when the paperwork was complete.[7]  (Docket Entry # 110-1, ¶ 39).

On February 1, 2011, Chammas became Dana-Farber's controller.  (Docket Entry # 103, ¶ 13) (Docket Entry # 109, ¶ 13).  In 2011, Sweeney was promoted to supervise plaintiff's work.[8]  (Docket Entry # 110-1, ¶ 69).  Plaintiff, however, still "reported only to George Peddle ('Peddle') and in his absence Melissa Chammas."  (Docket Entry # 110, ¶ 28) (internal quotation marks omitted).

In 2005, plaintiff was asked to come in 15 minutes early, 8:45 a.m. rather than 9:00 a.m., each day because of increased work volume and cash handling.[9]  (Docket Entry # 110-1, ¶ 42) (Docket Entry # 110, ¶ 9) ("When I started working, I was hired to begin at 9:00AM and work to 5:00" p.m.).[10]  For example, plaintiff's petty cash distribution was increased from $1,000 to $3,000.  (Docket Entry # 110, ¶ 9).  Plaintiff "submitted

---

[7]  See footnote five.

[8]  Plaintiff states that a week after Chammas was promoted, Sweeney was also "promoted."  (Docket Entry # 110, ¶ 8). Sweeney, however, attests she was not promoted until June 2013. (Docket Entry # 96, ¶ 3).  The record, however, is viewed in plaintiff's favor.

[9]  Defendants dispute this, stating that the overtime was established solely to accommodate Zakim Center patients. (Docket Entry # 97, ¶ 7).  Here again, the record is construed in plaintiff's favor.

[10]  The above quotation contains an error stating that plaintiff worked until 5:00 a.m. rather than 5:00 p.m.  (Docket Entry # 110, ¶ 9).

timesheets to her managers that included fifteen minutes of overtime daily," in addition to 40 hours weekly. "[H]er managers approved the overtime" from 2005 to 2012. (Docket Entry # 103, ¶¶ 14, 31) (Docket Entry # 109, ¶¶ 14, 31). She began working overtime in the first half of 2005. (Docket Entry 110, ¶ 9). Plaintiff stopped accepting payments from Zakim Center patients in early 2012 when the responsibility transferred to the Friends Place Boutique at the hospital. (Docket Entry # 103, ¶ 15) (Docket Entry # 109, ¶ 15). After she stopped working with the Zakim Center, plaintiff received a new responsibility of receiving "two to three deposits from these departments in the morning and also to provide a fund for exchanging large bills in lesser value." (Docket Entry # 110, ¶ 10).

Nevertheless, Steven Connelly ("Connelly"), the finance director, emailed Chammas and Peddle on January 24, 2012 to inform them they had modified plaintiff's schedule a number of years ago to "accommodate Zakim patients" and, if there was no longer a need to open early, they needed to eliminate the overtime. (Docket Entry # 98-4) (Docket Entry 110, ¶ 33). On February 7, 2012, Peddle informed plaintiff in an email that her new working hours were "8:30AM to 5:30PM with an hour coverage for lunch . . . [providing] 8 hours of paid working time." (Docket Entry # 98-5).

12

Also, on February 7, 2012, Peddle approached plaintiff about her overtime. (Docket Entry # 98-1, p. 19). Peddle stated, "Melissa sent me to stop you to entering unauthorized 15 minute overtime" and that Chammas informed him that plaintiff would "pay the consequences for doing that." (Docket Entry # 98-1, p. 19).[11] Plaintiff refused to accept that she had done anything wrong. (Docket # 110-1, ¶ 54). After the conversation regarding overtime, plaintiff went to Dana-Farber's Occupational Health Services ("OHS"). Plaintiff was registered as having high blood pressure. (Docket Entry # 110, ¶ 9). Previously, plaintiff had never had high blood pressure. (Docket Entry # 110, ¶ 9). Plaintiff immediately stopped entering overtime and reported the incident to the Human Resources Department ("HR"). (Docket Entry # 110-1, ¶ 56). Plaintiff started losing sleep after this exchange and her "mental state was stressful in the extreme." (Docket Entry # 110, ¶ 109).

On February 7, 2012, plaintiff also met with Dean to discuss the accusations and what had happened. (Docket Entry #

---

[11] Defendants do not object to this hearsay. See Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 421 n.2 (1st Cir. 2014) (finding because the plaintiff did not object to the admission of an affidavit, the court was free to consider it); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"). Peddle's recitation of Chammas' statement is considered only for the effect on the listener, plaintiff, and to show discriminatory intent, if any.

13

98-1, p. 22) (Docket Entry # 110, ¶ 12, sent. 1).[12]   Plaintiff
told Dean "what's happened, how [Peddle] told [her]" and asked
"how [could] [she] know [she had] to stop overtime, to writing
that, nobody told [her]."  (Docket Entry # 98-1, p. 23).
Plaintiff also discussed with Dean if HR had lost or received
any documentation about her promotion from management.  (Docket
Entry # 110, ¶ 14, sent. 2).  After plaintiff met with HR, Dean
emailed Peddle and Chammas on March 22, 2012 suggesting that
they review the job function and compensation of cashier.
(Docket Entry # 97-1).[13]   Chammas agreed with Dean.  (Docket
Entry # 97, ¶ 9).  In June 2012, the grade level for plaintiff's
position changed from grade 12 to grade 14.  (Docket Entry #
103, ¶ 23) (Docket Entry # 109, ¶ 23).  Plaintiff received a 17%
raise as a result.  (Docket Entry # 103, ¶ 23) (Docket Entry #
109, ¶ 23).

---

[12]  Defendants dispute that plaintiff met with Dean to discuss
the false accusations and characterize her deposition testimony
as saying she met with Dean to "discuss her complaint about the
elimination of her overtime."  (Docket Entry # 103, ¶ 19).  The
companion opinion on the motion to strike explains that
plaintiff's deposition does not directly contradict the
corresponding portion of her affidavit and that the relevant
portion of the first sentence of affidavit paragraph 12 remains
in the record.  Finally, the record is viewed in plaintiff's
favor.
[13]  Defendants dispute the contention that the change in position
and pay was Dean's idea.  Rather, Chammas had already been
reviewing the position of cashier as "part of her broader
assessment of General Accounting."  (Docket Entry # 103, ¶ 20)
(Docket Entry # 109, ¶ 20).

On March 30, 2012, Peddle asked Sweeney and plaintiff to rewrite the cashier's booth procedure book.  (Docket Entry # 103, ¶ 28) (Docket Entry # 109, ¶ 28).  When Sweeney proposed a time to meet to begin the process of updating the manual, plaintiff stated it would have to wait until next week because she was busy.  (Docket Entry # 103, ¶ 29) (Docket Entry # 109, ¶ 29) (Docket Entry # 110, ¶ 20).  The first and last week of every month were especially busy for plaintiff.  (Docket Entry # 110, ¶ 20).  Throughout the process, plaintiff observed Sweeney being rude and ridiculing employees.  (Docket Entry # 110, ¶ 19).  Plaintiff cried almost every day because of Sweeney during this time period.  (Docket Entry # 110, ¶ 19).

In April 2012, plaintiff complained to Peddle that her co-workers were not providing adequate coverage for her at work.  (Docket Entry # 103, ¶ 30) (Docket Entry # 109, ¶ 30).  On May 17, 2012, Colleen O'Neil ("O'Neil"), a senior accountant, sent an email to Chammas and Peddle asking if she could "discuss [her] working relationship with [plaintiff]" because she had been trying to "ignore how rude" plaintiff was to her but could not do it for much longer.[14]  (Docket Entry # 97-3) (Docket Entry # 103, ¶ 31) (Docket Entry # 109, ¶ 31).  On September 30, 2012,

---

[14]  The above statement is not considered for the truth of the matter asserted, i.e., plaintiff's rudeness to O'Neil, but rather for the effect on the listener, namely, Chammas and Peddle.

plaintiff received her 2012 annual performance review.  (Docket
Entry # 98-8).  Peddle drafted the review and Chammas "reviewed
and approved" it.  (Docket Entry # 103, ¶ 32) (Docket Entry #
109, ¶ 32).  Plaintiff received ratings of "exceeds
expectations" in several areas, including customer service,
maintenance of accurate and detailed cash logs, and quality
management.  (Docket Entry # 103, ¶ 35) (Docket Entry # 109, ¶
35).  Plaintiff received a rating of "needs further development"
in teamwork and collaboration.  (Docket Entry # 103, ¶ 36)
(Docket Entry # 109, ¶ 36).  The review stated there had been
"disagreements with a Sr. Accountant over lunch coverage . . .
when [plaintiff] very vocally complained about her continually
being late" and in the "interaction between the Sr. Accountant
and [plaintiff] while they were reviewing booth procedures . . .
the Sr. Accountant felt any opinion she had to offer was not
welcomed."  (Docket Entry # 98-8).

     This was the first time that a complaint had been issued
against her in ten-and-a-half years at Dana-Farber.  (Docket
Entry # 110-1, ¶ 81).  The 2012 review recognized that
"[plaintiff] works very well with customers . . . she also works
well and communicates well with employees of other departments."
(Docket Entry # 98-8).  Over the course of her employment,
plaintiff had received many compliments from other employees,
her supervisors, and patients regarding her work.  (Docket Entry

# 110-8) (Docket Entry # 110-20).[15]   Sweeney often provided lunch coverage for plaintiff and complaints were lodged by hospital staff and patients about poor service at the cashier booth. (Docket Entry # 110-1, ¶ 83).   Plaintiff obtained letters from customers who identified that it was not plaintiff at the cashier booth and one letter, dated October 10, 2012, detailing an unpleasant interaction with Sweeney.[16]   (Docket Entry # 110-1, ¶ 84) (Docket Entry # 110-20).   Plaintiff forwarded these emails to Chammas and Peddle.   (Docket Entry # 110-20).

On November 26, 2012, plaintiff wrote an email to Peddle stating "I have a feeling that you and Melissa penalized me with my race."   (Docket Entry # 103, ¶ 42) (Docket Entry, # 109, ¶ 42).   Plaintiff later clarified she meant "raise" not "race." (Docket Entry # 103, ¶ 45) (Docket Entry # 103, ¶ 45).   In the

---

[15]  These exhibits contain emails praising plaintiff and include statements from employees saying plaintiff "has always been very helpful and polite and does her [d]ue diligence during all the business interactions that I have had with her" and "Thank you for your input as I know you have a wealth of knowledge." (Docket Entry # 110-20).   An email from Sweeney states, "You are the best!"  (Docket Entry # 110-8).   These are just a sample of the emails that plaintiff filed.  (Docket Entry # 110-20). These emails containing third-party statements by others are not used for the truth of the matter asserted by the third party, but rather to show that Chammas had notice that plaintiff was receiving praise.   The handwritten notations are not considered and, in any event, would not alter the recommended disposition of the summary judgment motion.

[16]  This email containing a third-party statement is not used for the truth of the matter asserted by the third party, but rather to show that Chammas had notice that there were complaints about Sweeney.

meeting regarding this email, plaintiff also expressed that she
wanted "all the lies that were written on [her] Review of 2012
to be deleted." (Docket Entry # 110, ¶ 27).

After Peddle was terminated for an unknown reason, Chammas
officially[17] promoted Sweeney to the role of general accounting
supervisor in May 2013. (Docket Entry # 97, ¶ 15) (Docket Entry
# 110-1, ¶ 69). Plaintiff felt that if anyone deserved to get
the supervisor position it was her because "[she] check and
correct everything what's [Sweeney] doing." (Docket Entry # 98-
1, p. 145). One of Sweeney's responsibilities was to supervise
plaintiff. (Docket Entry # 97, ¶ 15). On May 24, 2013,[18]
Chammas and Sweeney met with plaintiff to inform her that
Sweeney was her new supervisor. (Docket Entry # 103, ¶ 47)
(Docket Entry # 109, ¶ 47). Plaintiff asked Sweeney if she had
"ever had a nasty behavior towards [Sweeney] or had insulted
[Sweeney]." (Docket Entry # 110, ¶ 29). In response, plaintiff
observed Chammas yell and walk out the door. (Docket Entry #

---

[17] Plaintiff claims Sweeney was promoted unofficially in 2011 to
supervise her. (Docket Entry # 110-1, ¶ 69). Defendants
dispute this, asserting that Sweeney was not promoted until May
2013. (Docket Entry # 103, ¶ 46). Here again, the record is
construed in plaintiff's favor.

[18] There is a discrepancy in the record about the day that this
occurred. Defendants' LR. 56.1 statement lists the date as May
23, 2013. (Docket Entry # 103, ¶ 47) (Docket Entry # 109, ¶
47). Chammas' affidavit, however, lists the date as May 24,
2013. (Docket Entry # 97, ¶ 15). Additionally, the final
written warning lists the date as May 24, 2013. (Docket Entry #
97-13). The discrepancy is not material.

110, ¶ 29).  It was only on October 28, 2013, when plaintiff received her final written warning, that she found out she had received a verbal warning on May 24, 2013.  (Docket Entry # 110, ¶ 29, sent. 7).

After the meeting on May 24, 2013, plaintiff sent an email to Chammas stating that she did not trust Sweeney and that she had been bothered and affected a lot.  (Docket Entry # 103, ¶ 50) (Docket Entry # 109, ¶ 50).  Plaintiff, independently, had sought out the assistance of the Partners Employee Assistance Program ("EAP").  (Docket Entry # 110-1, ¶ 64) (Docket Entry # 98-1, pp. 50-51).  Additionally, Chammas scheduled a meeting with plaintiff on June 21, 2013 to discuss the availability of EAP.  (Docket Entry # 97, ¶¶ 16-17).  Connelly was also at the meeting, but plaintiff had not been informed that he would attend.  (Docket Entry # 98-1, p. 52) (Docket Entry # 110, ¶ 33).  Plaintiff "started crying right away" at the meeting. (Docket Entry # 98-1, p. 52).  Plaintiff felt that Chammas was portraying her as a problem.  (Docket Entry # 98-1, p. 52).

Throughout this time period, Chammas and Sweeney would call plaintiff and explain her wrongdoing during the busy cashier's booth hours.  (Docket Entry # 110-1, ¶ 71).  Plaintiff would attempt to provide an email summary of the calls to prove there was no wrongdoing on her part.  (Docket Entry # 110-1, ¶ 71).

In late September 2013, plaintiff received her 2013 annual
performance review from Chammas.  (Docket Entry # 103, ¶ 55)
(Docket Entry # 109, ¶ 55).  "Chammas rated [plaintiff's]
performance as meeting expectations or exceeding expectations in
all areas except adaptability and teamwork/collaboration."
(Docket Entry # 103, ¶ 56) (Docket Entry # 109, ¶ 56).
Plaintiff received a rating of "unsatisfactory" in both
adaptability and teamwork/collaboration.  (Docket Entry # 103, ¶
56) (Docket Entry # 109, ¶ 56).  Under adaptability, Chammas
wrote that plaintiff needed to "cooperate with her new
supervisor."  (Docket Entry # 103, ¶ 57) (Docket Entry # 109, ¶
57).  Under teamwork/collaboration, Chammas wrote, "there were
instances of unprofessional behavior that bordered on
insubordination when she was informed of her new reporting
relationship to the accounting supervisor."  (Docket Entry #
103, ¶ 58) (Docket Entry # 109, ¶ 58).  Plaintiff wrote an email
on September 24, 2013 to Chammas and Connelly expressing that
she disagreed with the review.  (Docket Entry # 98-14).
Plaintiff also expressed that she believed Sweeney was looking
for an "opportunity how she can accuse me and eliminate from
this department" because Sweeney was still angry about the
incident with Hershberger in 2005.  (Docket Entry # 98-14).
After her meeting with Chammas and Sweeney regarding the 2013
review, plaintiff called the Compliance Hotline to complain

about Chammas.   (Docket Entry # 110-3, p. 12) (Docket Entry # 110, ¶ 40).

On October 1, 2013, Sweeney informed plaintiff that a new accountant, Connie Wong ("Wong"), was starting work.   (Docket Entry # 110-43).   Sweeney informed plaintiff she would schedule a time next week for plaintiff to train Wong.   (Docket Entry # 97-9).   However, on October 3, 2013, the employee who was supposed to train Wong the following day became sick.   (Docket Entry # 97-9).   Sweeney asked plaintiff if she could train Wong the following day, but plaintiff informed Sweeney she was busy with paperwork from "t-passes" and that she could find time next week.   (Docket Entry # 97-9).   Chammas, who was copied on the email, replied that she really needed plaintiff "to be a team player."   (Docket Entry # 97-9).   Plaintiff responded, in part, as follows:

> [Chammas] it is completely wrong how you trying to talking with me using power and not understanding me and my job . . . I will repeat I am very busy I have to enter a lot petty cash in order to not come in situation to be wit out [sic] money for daily operation . . . yesterday I started to think what is the best starting for her if she is coming Monday.  I don't have any reason not to be only nice and help . . . .  Because you interpreting always whatever I saying how is best for you to blame me for my very honest answers . . . [Chammas] it is up to you noting is my resistance only because of money for next week, But at the end I have to tell you again it is completely wrong how you reacting when I saying only situation here.  Your decision as you said you are manager and please think about everything.

(Docket Entry # 97-9) (punctuation and grammar in original).
Chammas "considered this response to be insubordinate." (Docket
Entry # 103, ¶ 65) (Docket Entry # 109, ¶ 65).

On October 2, 2013, plaintiff emailed Chammas regarding an
issue with employees taking t-passes without signing for them.
(Docket Entry # 98-15).  Plaintiff asked Chammas, "is it okay
behavior from Payroll Department and also for [Sweeney] to not
mark and take proper care for this place when I am on my
lunc[h], vacation or have day off"?  (Docket Entry # 98-15).
When plaintiff had returned from vacation, she discovered that
"the register machine did not work, the credit machine did not
work" and other problems, including that "$45.00 was missing."
(Docket Entry # 110, ¶ 38).  Sweeney was plaintiff's backup
while she was on vacation.  (Docket Entry # 110, ¶ 38).

On October 9, 2013, Sweeney sent an email to plaintiff
offering to help her enter petty cash.  (Docket Entry # 97-10).
Plaintiff had already finished counting and manually entering
everything.  (Docket Entry # 110, ¶ 46).  Plaintiff responded,
"[t]hank you for offering your help for entering Petty Cash, but
can you check for Melisa's opinion for helping me or not . .
.[?]" (Docket Entry # 97-10).  Chammas replied, "[m]y opinion is
not needed as Linda is your direct supervisor and is offering to
help you get caught-up on work you have gotten behind on."
(Docket Entry # 97-10).  Plaintiff, in response, forwarded

22

Chammas and Sweeney the email about training Wong and wrote, in part, "my opinion [i]s you trying to cover (team work) what you did wrong in the past . . . below is reminder why I asking for your opinion." (Docket Entry # 97-10). Based on plaintiff's email correspondences after receiving the 2013 review, Chammas issued a verbal warning to plaintiff on October 10, 2013. (Docket Entry # 97, ¶¶ 18-21). The verbal warning stated that plaintiff had to stop sending "long and convoluted emails" that prevent her work from "being completed in an accurate and timely manner," and "any future occurrences of this type of email activity will result in a written warning." (Docket Entry # 103, ¶ 72) (Docket Entry # 109, ¶ 72) (Docket Entry # 97-11).

Plaintiff did not believe she needed to change her behavior and therefore "didn't change anything." (Docket Entry # 110, ¶ 51) (Docket Entry # 98-1, p. 58). On October 17, 2013, Sweeney asked plaintiff to describe what was wrong with the cash register. (Docket Entry # 98-18). Plaintiff responded she was not sure what the problem was and that Irina Michlin ("Michlin"), a staff accountant, could "help you whit [sic] advice what is the best or wrong." (Docket Entry # 98-18) (Docket Entry # 103, ¶ 10) (Docket Entry # 109, ¶ 10). Chammas considered this response to be "insubordinate in tone." (Docket Entry # 97, ¶ 22). On October 23, 2013, Sweeney asked plaintiff when Dunbar Armored picked up and dropped off the cash deposits.

(Docket Entry # 103, ¶ 75) (Docket Entry # 109, ¶ 75).
Plaintiff responded, "when you coming today you can check Dunbar
red [b]ook then you can have right and very accurate information
. . . this e-mail interrupted me to do my job . . . you coming
here once a week and you had chance to check everything."
(Docket Entry # 97-12).  Plaintiff also stated that there were a
lot of problems and that the problems were not being solved by
emails, instead only "right work" would solve the problems.
(Docket Entry # 97-12).

On October 24, 2013, plaintiff emailed Sweeney stating that
she needed change in $5 bills as soon as possible.  (Docket
Entry # 110-52).  Sweeney responded, with Chammas copied on the
email, that "if the change is for parking, please let them know
that you do not have change and they will need to go to the bank
for change."  (Docket Entry # 110-52).  The new protocol for
dealing with change was also communicated to her by Chammas and
Barberio.  (Docket Entry # 110, ¶ 54).  Plaintiff "automatically
told everyone who was back-up for [her] lunch" about the new
protocol.  (Docket Entry # 110, ¶ 54).

On October 28, 2013, Chammas issued a final written warning
to plaintiff.  (Docket Entry # 97-13).  One of the reasons cited
for the issuance of the final written warning was that plaintiff
had instructed an employee of Dana-Farber to go to the bank for
change on October 28, 2013, "which was against established

24

practice for handling change requests." (Docket Entry # 97, ¶ 23). The other reasons cited in the final written warning were "lack of focus on [plaintiff's] work and continuing [to] send[] long and convoluted emails" and "not working as a collaborative team member and exhibiting unprofessional behavior when interacting with the Account Supervisor." (Docket Entry # 97-13). The meeting regarding the final written warning started with Chammas accusing plaintiff of using payroll in an unauthorized manner, according to plaintiff. (Docket Entry # 110-2, ¶ 91). Plaintiff refused to look at the paperwork, pushed it back, and cried. (Docket Entry # 110, ¶ 55). Plaintiff stated "it was not true." (Docket Entry # 110, ¶ 55). After the meeting, plaintiff asked OHS to measure her blood pressure because she "had feeling [she] would be faint in [her] office." (Docket Entry # 110, ¶ 55).

In mid-November, plaintiff found a payroll report in the safe in her booth. (Docket Entry # 110, ¶ 56, sent. 5). Plaintiff "sent an e-mail that [she] found [the] [p]ayroll report." (Docket Entry # 110, ¶ 56, sent. 12). The report was "hidden behind the money in the corner under the green bag." (Docket Entry # 110, ¶ 56, sent. 14). Plaintiff showed the report to Dean on the date she was fired. (Docket Entry # 110, ¶ 56, sent. 19). Chammas was present when plaintiff showed the

report to Dean and began yelling at plaintiff.  (Docket Entry #
110, ¶ 56, sent. 18, 20).

On October 8, 2013, before receiving the second verbal
warning, plaintiff reached out to Dana-Farber's Vice President
and Chief Human Resources Officer Deborah Hicks ("Hicks").
(Docket Entry # 110, ¶ 57).  Plaintiff met with Hicks on
November 4, 2013.  (Docket Entry # 103, ¶¶ 80-81) (Docket Entry
# 109, ¶¶ 80-81) (Docket Entry # 98-22).  Plaintiff explained to
Hicks "everything that is[sic] been happening" since she was
accused of entering unauthorized overtime and asked for
permission to "refute all of these lies."  (Docket Entry # 110,
¶ 58).  On November 14, 2013, Hicks sent plaintiff a letter
stating in part, "it is quite clear that there is a true
disconnect regarding performance between you and your manager."
(Docket Entry # 98-22).  Hicks indicated that she had met with
Chammas and reviewed all the materials that plaintiff had
provided her.  (Docket Entry # 98-22).  Hicks also stated that
she could not "validate that [plaintiff's] management team [had]
behaved in any way that would be in violation of DFCI policies
or against [its] core values of compassion and respect."
(Docket Entry # 98-2).

On November 8, 2013, plaintiff learned from Chammas that
beginning on November 18, 2013 the cashier's booth would close
from 1:00 p.m. to 1:30 p.m., during plaintiff's lunch break.

(Docket Entry # 97, ¶ 26) (Docket Entry # 97-14).  On December
5, 2013, Chammas and Sweeney met with plaintiff to inform her
that the booth would close at 3:00 p.m. starting on January 6,
2013.  (Docket Entry # 103, ¶ 95) (Docket Entry # 109, ¶ 95).
Plaintiff was expected to go to 10BP at 3:00 p.m. and work there
until 5:00 p.m.  (Docket Entry # 103, ¶ 95) (Docket Entry # 109,
¶¶ 93, 95).  Chammas began considering the proposal in 2012 and
met with Connelly in 2013 to discuss it.  (Docket Entry # 103,
¶¶ 86, 91).  According to Chammas, the change was spurred by a
decrease in patient payment activity.  (Docket Entry # 97, ¶
10).  Chammas believed that having the cashier work in general
accounting would "enable the other members of the General
Accounting team to accomplish more accounting work, as well as
provide greater opportunities for interaction between the
Cashier and the rest of General Accounting."  (Docket Entry #
97, ¶ 10).[19]  Plaintiff's responsibilities, however, had
increased and changed for approximately 70% of her work.
(Docket Entry # 110, ¶ 63).  Plaintiff disagreed with the
decision, based on the amount of work she had, but she did not
express that disagreement.  (Docket Entry # 98-1, pp. 100-101).
When Chammas and Sweeney discussed the change with plaintiff,

---

[19]  As determined in the ruling on the motion to strike,
plaintiff's response in paragraph 63 of her affidavit (Docket
Entry # 110, ¶ 63) does not controvert this fact.  (Docket Entry
# 109, ¶ 86) (Docket Entry # 97, ¶ 10).

Chammas stated the reason for the decision was to "better communicate."[20]  (Docket Entry # 110, ¶ 69).  As Chammas uttered the word communicate, she turned toward Sweeney and pronounced the word "communicate" in a way that conveyed to plaintiff she was "mock[ing] a person, like [her], who has English as a second language."  (Docket Entry # 110, ¶ 69).  Chammas and Sweeney then laughed.  (Docket Entry # 110, ¶ 69).  The fact that plaintiff would be expected to do filing was never discussed.  (Docket Entry # 110, ¶ 95, sent. 6, first clause).  When plaintiff tried to find out what her new responsibilities would be, she never received a response.  (Docket Entry # 110, ¶ 95).

On December 31, 2013, plaintiff "slipped and fell on the stairs owned and maintained by Dana Farber, . . . in front of Dana Farber Cancer Institute."  (Docket Entry # 110, ¶ 70).  Plaintiff suffered cuts and bruising on her knees, forehead, chin, nose, eye and "both hands, especially on [her] right hand."  (Docket Entry # 110-69) (Docket Entry # 98-1, pp. 68-69).  Plaintiff was treated at OHS, advised to go home and self-treat, and "if her symptoms worsen, she should contact her PCP for further evaluation."  (Docket Entry # 110-69).  It was t-pass time, so plaintiff helped Wong with the deposits for an

---

[20]  The above statement is not considered for the truth of the matter asserted.  Rather, it is being used for how the statement was communicated and as, evidence of discriminatory intent, if any.

hour before heading home.  (Docket Entry # 98-1, p. 70) (Docket Entry # 110, ¶ 72).  Plaintiff attests that she helped Wong because she takes her work "very seriously, and attend[s] work if at all possible, despite pain and suffering."  (Docket Entry # 110, ¶ 72).

Plaintiff stayed at home, mostly in bed, on New Year's Eve and returned to work on January 2, 2014.  (Docket Entry # 110, ¶ 73).  Carole Capone ("Capone") in OHS came to plaintiff's office and briefly examined her on January 2, 2014.  (Docket Entry # 110, ¶ 75).  Capone indicated that the abrasion on plaintiff's right wrist was "healing well" and there was no tenderness.  (Docket Entry 100-69).  Plaintiff worked on January 2 and 3, 2014 because she knew many people were off for the holiday.  (Docket Entry # 110, ¶ 74).  Plaintiff avoided holding heavy items, such as money, while working.  (Docket Entry # 98-1, p. 78).

On January 6, 2014, plaintiff arrived at 10BP at approximately 3:00 p.m. and began by cleaning a table used by O'Neil, which took slightly less than half an hour.  (Docket Entry # 110, ¶ 79).  She also advised Sweeney that she was unable to finish her cashier's job.  (Docket Entry # 98-1, p. 81).  As a result and with Sweeney's permission, plaintiff completed a few "pages of petty cash" related to her cashier's job.  (Docket Entry # 98-1, pp. 81, 83-84).  Sweeney then

instructed plaintiff to perform various tasks, each for 15
minutes at a time.  (Docket Entry # 98-1, pp. 81-82).  When
Sweeney directed plaintiff to do some filing for 15 minutes,
plaintiff refused.  (Docket Entry # 98-1, pp. 81-82).  Plaintiff
was first instructed that she would have to complete filing on
January 6, 2014.  (Docket Entry # 110, ¶ 65).  She told Sweeney
to "see my hand" and that she was "not able to do" the filing.
(Docket Entry # 98-1, pp. 81-82).  Plaintiff went home for the
day without performing any filing.  In fact, she did not even
attempt to perform filing to determine if the task caused pain
to her wrist.  (Docket Entry # 98-1, p. 83); (Docket Entry #
110, ¶ 79) ("I cannot file documents"); (Docket Entry # 109, ¶
110).

Chammas made an appointment for plaintiff with OHS on
January 8, 2014.  (Docket Entry # 98-26).  Plaintiff, however,
was not feeling well and made an appointment on January 7, 2014.
(Docket Entry # 98-26).  At approximately 1:45 p.m. on January
7, 2014, she told Chammas that she wanted to go to OHS and then
"go home."  (Docket Entry # 98-1, p. 87).  Chammas agreed and
gave plaintiff permission to go to OHS and then go home.
(Docket Entry # 98-1, p. 87).  On January 9, 2014, plaintiff
visited her primary care doctor, Dr. Jorge Tello ("Dr. Tello").
(Docket Entry # 103, ¶ 115) (Docket Entry # 109, ¶ 115).  X-rays
were taken and showed that plaintiff had no fractures.  (Docket

Entry # 103, ¶ 116) (Docket Entry # 109, ¶ 116).  Plaintiff had
mild swelling in her right wrist and reported ongoing pain.
(Docket Entry # 98-28) (Docket Entry # 98-28).  The report
indicated that plaintiff had anxiety and stated it was "mainly
related to stress at work" along with "some mild insomnia."
(Docket Entry # 98-28).  Dr. Tello stated "pt would benefit
greatly from talk therapy" and gave plaintiff information on
ways to contact a therapist.  (Docket Entry # 98-28).

     On Friday, January 10, 2014, plaintiff attempted to go to
work.  (Docket Entry # 103, ¶ 120) (Docket Entry # 109, ¶ 120).
OHS did not allow plaintiff to return because it had not
received a letter from Dr. Tello medically clearing her.
(Docket Entry # 103, ¶ 121) (Docket Entry # 109, ¶ 121).  Dr.
Tello provided the letter medically clearing plaintiff for work
on January 10, 2014.  (Docket Entry # 98-29).  Dr. Tello stated
that plaintiff was "recovering from a fall and sprain of the
right hand and wrist."  (Docket Entry # 98-29).  Plaintiff
returned to work on Monday, January 13, 2014.[21]  (Docket Entry #
103, ¶ 123) (Docket Entry # 109, ¶ 123).  Plaintiff signed a
medical status determination form indicating she was able to
perform the essential functions of the cashier's job.  (Docket

---

[21]  The date is mistakenly identified in defendants' consolidated
LR. 56.1 statement of facts as "January 13, 2013" rather than
January 13, 2014.  (Docket Entry # 98-1, p. 76).

Entry # 98-31).  Plaintiff had never received an updated list of
responsibilities after she began working at 10BP, despite
requesting one from Chammas and Sweeney.  (Docket Entry # 110, ¶
95).  However, "having been there on the 6th of January," she
acknowledged she would "expect that [she] would be expected to
do some filing in general accounting."  (Docket Entry # 98-1, p.
92).

When plaintiff arrived at 10BP on January 13, 2014, Sweeney
asked plaintiff to do filing.  (Docket Entry # 103, ¶ 129)
(Docket Entry # 109, ¶ 129).  Plaintiff told Sweeney "I cannot
file because my hands hurt me and I have to finish paperwork
from Petty Cash that missing almost $1400.00 for all three days
since I was off."  (Docket Entry # 110, ¶ 98).  When Sweeney
repeated again that plaintiff needed to file, plaintiff "said
again that [she] cannot" that her hands hurt and she was
"already coming too tired from [her] workplace."  (Docket Entry
# 110, ¶ 98).  Plaintiff did no filing on January 13, 2014.
(Docket Entry # 98-1, pp. 97-98).  Chammas considered this to be
insubordination and sent plaintiff home.  (Docket Entry # 97, ¶
32).  Chammas thereafter emailed Jerome Saunders ("Saunders") in
HR informing him that plaintiff refused to file and she wanted
to meet regarding the matter.  (Docket Entry # 97-17) (Docket
Entry # 110, ¶ 40).

On January 14, 2014, at 9:46 a.m., plaintiff emailed
Chammas asking for the day off on January 23, 2014 because she
had a doctor's appointment. (Docket Entry # 110-72). Chammas
agreed that plaintiff could take the day off. (Docket Entry #
110-72). Plaintiff had an appointment with a psychologist on
January 23 but did not inform Chammas about the nature of the
appointment. (Docket Entry # 110-72). On "the morning of
January 14, Chammas met with Saunders to discuss [plaintiff's]
termination." (Docket Entry # 103, ¶ 134) (Docket Entry # 109,
¶ 134). On the afternoon of January 14, 2014, plaintiff asked
Kathy Medeiros ("Medeiros") in OHS how to apply for leave under
the FMLA. (Docket Entry # 103, ¶ 143) (Docket Entry # 109, ¶
143).

On the morning of January 16, 2014, plaintiff met with
Dana-Farber's leave coordinator Ivon Perez-Thorton ("Perez-
Thornton"). (Docket Entry # 103, ¶ 145) (Docket Entry # 109, ¶
145). There is no indication that either Mederios or Perez-
Thorton informed Chammas about their meetings with plaintiff.
Plaintiff's employment was terminated on January 16, 2014 by
Chammas. (Docket Entry # 98-32). The reasons stated for
termination included "not working as a collaborative team
member" and "refusal to perform, on several occasions, duties
that you were directly asked to accomplish . . .." (Docket
Entry # 98-32). Plaintiff explained at the meeting that she did

not perform the filing because of her injuries.  (Docket Entry # 110, ¶ 103).  Plaintiff did not receive written notice of her termination until January 27, 2014, after she requested it by email.  (Docket Entry ## 98-32, 110-1).

At the time of termination, plaintiff was making approximately $19.91 an hour.  (Docket Entry # 110-2, ¶ 114).  Plaintiff was terminated with "no severance, unpaid, unused personal day, or unpaid, unused sick days (more than 500)." (Docket Entry # 110-1, ¶ 115).  Plaintiff lost her health insurance within two days of being fired.  (Docket Entry # 110, ¶ 112).

After plaintiff's termination, Sara Johnson ("Johnson") began working as a cashier on May 12, 2014.  (Docket Entry # 103, ¶ 151) (Docket Entry # 109, ¶ 151).  Johnson was promoted to staff accountant I one year later on May 31, 2015 and promoted to staff accountant II on January 24, 2016.  (Docket Entry # 103, ¶ 151) (Docket Entry # 109, ¶ 151).  On April 19, 2016, Andrew Wong was hired as staff accountant I to perform the cashier's duties and general accounting tasks.  (Docket Entry # 103, ¶ 154) (Docket Entry # 109, ¶ 154).

Neither Chammas nor Sweeney ever made comments to plaintiff regarding her age.  (Docket Entry # 98-1, p. 56).  No one at Dana-Farber ever commented on plaintiff's Bosnian national origin.  (Docket Entry # 98-1, pp. 54-56).  Plaintiff believes

34

that Chammas "set her up to fail" because she made a complaint
about the overtime issue.  (Docket Entry # 98-1, p. 23).

<u>DISCUSSION</u>

Dana-Farber seeks summary judgment on counts VI, VII, VIII,
IX, and XII.  Chammas and Sweeney, collectively, seek summary
judgment on counts III, IV, V, VIII and XII.

I.  <u>Tortious Interference with Contractual Relations (Count III)</u>

Chammas and Sweeney argue that summary judgment should be
granted as to Count III, tortious interference with contractual
relations, because plaintiff fails to produce evidence showing
Chammas and Sweeney acted with malice.  (Docket Entry # 102, pp.
7-8) (citing <u>Zimmerman v. Direct Fed. Credit Union</u>, 262 F.3d 70,
75-76 (1st Cir. 2001)).  Plaintiff misreads Chammas and
Sweeney's position by contending that the claim is not barred by
the exclusivity provision of the Massachusetts Workers
Compensation Act ("MWCA" or "chapter 152"), Mass. Gen. Laws ch.
152, an argument not advanced by Chammas and Sweeney.  (Docket
Entry # 108).  Plaintiff's failure to counter Chammas and
Sweeney's argument acts as a waiver.  See <u>Vallejo v. Santini-
Padilla</u>, 607 F.3d 1, 7 n.4 (1st Cir. 2010) ("[p]laintiffs have
not cited a single authority in support of their assertion that
their failure to timely oppose the motion to dismiss did not
constitute waiver" and noting that "[p]laintiffs did not
properly raise their arguments below").  In the alternative,

this court turns to the merits of Chammas and Sweeney's argument.

Gleaning the substance of the claim from the record, plaintiff testified that Chammas interfered with her employment through false and negative statements in performance reviews as well as in the verbal and the final written warning.  (Docket Entry # 98-1, p. 125).  Plaintiff also testified that Chammas interfered with her employment by lying about plaintiff's promotion since 2008, lying about plaintiff's promotion in 2011, and accusing plaintiff of stealing overtime in February 2012.[22] In addition, at various times Sweeney interfered with plaintiff's employment by being "rude" and "impolite" while covering the booth during plaintiff's lunch and vacation, according to plaintiff's deposition testimony.  (Docket Entry # 98-1, pp. 128-135).  Plaintiff also testified that Sweeney took credit for plaintiff's work and was "lying constantly to managers and employees in the finance department about [her]," which manifested in negative performance reviews.[23]  (Docket Entry # 98-1, p. 130).

_____

[22]  Although defendants incorrectly cite the overtime accusation as occurring in 2007, plaintiff testified in her deposition that it occurred on February 7, 2012.  (Docket Entry # 98-1, p. 19).
[23]  When asked at her deposition if the statements that plaintiff claims were lies by Sweeney were included in her performance reviews, plaintiff responded, "I don't know how they came to this statement, even to writing that, I don't know."  (Docket Entry # 98-1, p. 131).

Chammas and Sweeney correctly assert that any statements made before July 10, 2012 are time barred because they fall outside the three-year statute of limitations applicable to the claim.  See Mass. Gen. Laws ch. 260, § 2A ("section 2A") ("[e]xcept as otherwise provided, actions of tort . . . shall be commenced only within three years next after the cause of action accrues"); Abdallah v. Bain Capital LLC, 880 F. Supp. 2d 190, 195 (D. Mass. 2012) (noting that tortious interference with contractual relations claim is subject to three-year statute of limitations); see also LeGoff v. Trustee of Boston Univ., 23 F. Supp. 2d 120, 129 (D. Mass. 1998) (recognizing that tortious interference with contractual relations claim is subject to section 2A's three-year statute of limitations).

In addition to untimeliness, Chammas and Sweeney argue that they did not act with actual malice.  (Docket Entry # 102, pp. 7-8).  Tortious interference requires a plaintiff to show "(1) she had a business relationship, (2) the defendant knew of this relationship, (3) that the defendant intentionally and maliciously interfered with the relationship, and (4) that the defendant's actions harmed her."  Zimmerman, 262 F.3d at 75-76. Although an employee cannot sue an employer for interfering with its own contract, an employee can sue a supervisor who tortuously interferes with a subordinate's relationship.  Id. The Massachusetts Supreme Judicial Court ("SJC"), however,

recognizes that a supervisor has a qualified privilege and will
not "be liable for employment decisions that are within the
scope of his supervisory duties." Id.; see also Gram v. Liberty
Mut. Ins. Co., 429 N.E.2d 21, 24 (Mass. 1981) (holding that
employee's supervisors did not intentionally interfere with
employee's contractual rights because they were "acting in the
scope of their employment responsibilities"). A plaintiff can
overcome the privilege with proof of actual malice, which serves
"as a proxy for proof that a supervisor was not acting on the
employer's behalf." Zimmerman, 262 F.3d at 76, n.5. Malice is
a "spiteful, malignant purpose, unrelated to the legitimate
corporate interest" rather than mere hostility. King v.
Driscoll, 638 N.E.2d 488, 494-495 (Mass. 1994); see also Comeau
v. Town of Webster, 881 F. Supp. 2d 177, 190 (D. Mass. 2012).

In the case at bar, plaintiff provides no evidence to show
that Chammas' actions, including writing poor performance
reviews and issuing verbal warnings, and Sweeney's coverage of
the booth and reports to managers were not related to legitimate
corporate interests. (Docket Entry # 110-1, ¶¶ 61, 65, 67, 83,
88). Plaintiff's explanation for these actions is that Sweeney
was upset that plaintiff got Sweeney's friend, Hershberger,
fired and Chammas was upset that plaintiff was promoted.
(Docket Entry # 98-1, p. 23) (Docket Entry # 108) (Docket Entry
# 110-1, ¶¶ 21, 99-100). Even if true, such motivation and

conduct fails to provide sufficient circumstantial or direct evidence of actual malice.  See King, 638 N.E.2d at 494-495 (holding that, despite evidence that supervisor was angry over employee's refusal to fire another employee, supervisor's personal traits were "insufficient to prove that [the supervisor] acted with actual malice"); see also Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241, 1245 (Mass. 1992) (holding that firing employee for complaining to survey team was not unrelated to legitimate corporate interest). Plaintiff therefore fails to provide sufficient evidence of actual malice to survive summary judgment.

It is also true that proof of unlawful discrimination "can be proof of actual malice, which is tantamount to proof that a supervisor was not acting on the employer's behalf."  Edsall v. Assumption College, 367 F. Supp. 2d 72, 84 (Mass. 2005).  For reasons stated in the analysis of counts VII to IX, however, plaintiff fails to present sufficient evidence to support a finding of discrimination.  Chammas and Sweeney are therefore entitled to summary judgment as to Count III.

## II.  IIED (Count IV)

Chammas and Sweeney argue that the exclusivity provision of the MWCA bars the IIED claim because the alleged conduct was conducted within the course of Chammas and Sweeney's employment

and in furtherance of Dana-Farber's interests.  (Docket Entry #
102, pp. 8-10).  Plaintiff maintains that their actions were not
in furtherance of their employer's interest but rather to
retaliate against plaintiff for reporting Hershberger's criminal
activity and to discriminate against plaintiff.  (Docket Entry #
108).  Plaintiff also argues that this court's prior ruling on a
motion to dismiss has a preclusive effect.  (Docket Entry #
108).

Turning to the latter argument, the prior ruling addressed
Chammas and Sweeney's procedurally incorrect motion to dismiss
the IEED claim for lack of subject matter jurisdiction under
Rule 12(b)(1) based on the exclusivity provision.  (Docket Entry
# 77, pp. 22-25).  As such, it was not an adjudication on the
merits of the IIED claim or the application of the exclusivity
provision to the merits of the claim.  Indeed, this court cited
De La Cruz v. Irizarry, 946 F. Supp. 2d 244, 249 (D.P.R. 2013),
to clarify that a dismissal under Rule 12(b)(1) is not an
adjudication on the merits and is without res judicata effect.
(Docket Entry # 77, p. 24).

Chapter 152, like most workers' compensation laws,
"provides the exclusive remedy, in most circumstances, for
claims by an injured employee against a covered employer."
Roberts v. Delta Air Lines, Inc., 599 F.3d 73, 77 (1st Cir.
2010).  Unless an employee gives his or her employer written

40

notice claiming a common law cause of action at the outset of
his or her employment, "employees are 'held to have waived their
right of action at common law in respect to an injury
compensable under'" chapter 152.  Id. (internal brackets and
ellipses omitted); see Estate of Moulton v. Puopolo, 5 N.E.3d
908, 915 (Mass. 2014) (although employee may "waive any
compensation payments under the act, the employee so choosing
must notify the employer in writing, at the time of hire, that
she does not waive the common-law right of action").  There is
no evidence that plaintiff provided such written notice at the
outset of her employment.  Inasmuch as plaintiff sustained the
alleged injuries in the course of her employment at Dana-Farber,
her employer, the exclusive remedy provision of chapter 152 bars
the IIED claim.  See Estate of Multon, 5 N.E.3d at 915 (as long
as employee sustained alleged injuries while "acting in the
course of her employment, . . . actions for negligence,
recklessness, gross negligence, and willful and wanton
misconduct by an employer are precluded by the exclusive remedy
provision").

Plaintiff also misinterprets what types of actions are
barred under the MWCA.  The exclusivity provision "bars common
law actions against employers where:  (1) the plaintiff is shown
to be an employee; (2) her condition is shown to be a personal
injury within the meaning of the worker's compensation act; and

41

(3) the injury is shown to have arisen out of and in the course
of her employment." Brown v. Nutter McClennen and Fish, 696
N.E.2d 953, 955 (Mass. App. Ct. 1998); accord Green v. Wyman-
Gorden Co., 664 N.E.2d 808, 813 (Mass. 1996). Further, the
statute states that "no mental or emotional disability arising
principally out of a bona fide, personnel action . . . except
such action which is the intentional infliction of emotional
harm shall be deemed to be a personal injury." Mass. Gen. Laws
ch. 152, § 29 ("section 29"); see also Mass. Gen. Laws ch. 152,
§ 1(7A) ("section 1(7A)"). Plaintiff takes this to mean that
actions resulting from intentional infliction of emotional
distress are not barred because they do not constitute a
personal injury. (Docket Entry # 108). The statute, however,
states the opposite. Mass. Gen. Laws ch. 152, § 29; see Green
v. Wyman-Gorden Co., 664 N.E.2d at 813-814. As framed by one
commentator, the provision in section 29 and the analogous
language in section 1(7A):

> *will bar tort actions for the intentional infliction of*
> *emotional harm by bringing them within the exclusive remedy*
> *provisions of the compensation act.* This would not,
> however, bar an action for defamation, fraud, false
> imprisonment, or the like, where the gist of the action is
> injury to reputation or personality, irrespective of
> physical or mental harm.

29 Mass. Practice Workers' Compensation § 9.10 (3d ed. 2017)
(emphasis added). Thus, "the intentional infliction of
emotional harm" is excluded from the exception to a compensable

personal injury for a "mental or emotional disability arising out of" a bona fide personnel action.  Mass. Gen. Laws ch. 152, § 29; accord Mass. Gen. Laws ch. 152, § 1(7A).  In paraphrasing the identical language in section 1(7A), the SJC in Green states in no uncertain terms that "intentionally inflicted emotional harm [is] compensable under [the] workers' compensation act, even when [the] result of bona fide personnel action."  Green v. Wyman-Gordon Co., 664 N.E.2d at 813.  Placement of the applicable commas to separate the except clause in section 29 clarifies the import of the provision.[24]  In sum, mental disabilities resulting from actions causing the intentional infliction of emotional harm are compensable personal injuries encompassed within the statute.  Mass. Gen. Laws ch. 152, §§ 1(7A), 29.

Plaintiff also argues that section 15 of chapter 152 excludes the IIED claim against coemployees Chammas and Sweeney because they are not "insureds" subject to the exclusivity bar.

---

[24]  With commas to separate the except clause, the sentence would read:

> No mental or emotional disability arising principally out of a bona fide, personnel action including a transfer, promotion, demotion, or termination[,] except such action which is the intentional infliction of emotional harm[,] shall be deemed to be a personal injury within the meaning of this chapter.

Mass. Gen. Laws ch. 152, §§ 1(7A), 29.

(Docket Entry # 108).  Section 15 states that "nothing in this section . . . shall be construed to bar an action at law for damages for personal injuries . . . against any person other than the insured party" and section one defines an insured person as "an employer who has provided by insurance for the payment to his employees."  Mass. Gen. Laws ch. 152, §§ 1, 15. It is well established, however, that the MWCA "provides the exclusive remedy against coemployees who engage in tortious conduct within the course of their employment and in furtherance of the employer's interest."  Brown v. Nutter, McClennen, and Fish, 696 N.E.2d at 956.  In other words, coemployees "are not immunized from suit by the workers' compensation act for tortious acts which they commit outside the scope of their employment, which are unrelated to the interest of the employer."  Brown v. Nutter, McClennen & Fish, 696 N.E.2d at 956.

Whether Chammas and Sweeney acted in the course of their employment presents an objective "test 'which assesses what the employee did and other facts in order to determine whether he [or she] acted at least in part for a job-related purpose.'" Brown v. Nutter, McClennen & Fish, 696 N.E.2d at 957.  Whereas they satisfy this test as a matter of law because the complained of conduct emanates from their work as supervisors for job-related duties, see id. at 956-57 (discussing O'Connell v.

Chasdi, 511 N.E.2d 349 (Mass. 1987), which determined that
conduct by director of institute sexually assaulting assistant
during business trip was done in course of director's
employment), it is a close question whether summary judgment is
warranted regarding whether the complained of conduct furthered
Dana-Farber's interest.  See id. (noting that "'intentional
torts are not an accepted risk of doing business'"); Bourbeau v.
City of Chicopee, 445 F. Supp. 2d 106, 117 (D. Mass. 2006).

Accordingly, this court turns to Chammas and Sweeney's
alternative argument to obtain summary judgment on the IIED
claim, namely, the absence of evidence of extreme and outrageous
conduct.  Thus, assuming that chapter 152 does not bar an IIED
claim against Chammas and Sweeney, they argue that the facts do
not constitute "extreme and outrageous conduct" as required to
establish an IIED claim.  (Docket Entry # 102, pp. 10-11).
Plaintiff maintains that Chammas' accusation of stealing
overtime allows a jury to find in her favor regarding this
essential element of an IIED claim.  (Docket Entry # 108).

An IIED claim requires a plaintiff to show that the
defendant "'(1) intended to inflict emotional distress by (2)
undertaking actions that were extreme and outrageous, thereby
(3) causing emotional distress which (4) was severe.'"  Young v.
Wells Fargo Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013); see
Kennedy v. Town of Billerica, 617 F.3d 520, 530 (1st Cir. 2010).

45

"Extreme and outrageous conduct is behavior that is 'so
outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community.'"
<u>Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d at 240 (quoting <u>Foley</u>
<u>v. Polaroid Corp.</u>, 508 N.E.2d 72, 82 (Mass. 1987)).
Massachusetts law, therefore, "creates an extremely high hurdle
which must be overcome in order to maintain" an IEED claim.
<u>Sneade v. Rojas</u>, Civil Action No. 11-40061-TSH, 2014 WL 949635,
at *8 (D. Mass. Mar. 10, 2014) (defendant officer's conduct of
shooting plaintiffs' pet, an 85 pound mixed-breed dog that ran
out of kitchen and barked at officer but then remained sitting,
lacked "requisite level of outrageousness and atrocity"); <u>see</u>
<u>Anderson v. Boston School Committee</u>, 105 F.3d 762, 764-765, 767
(1st Cir. 1997) (affirming directed verdict on IIED claim
concerning alleged harassment of teacher by principal).
Accusing an employee of taking unauthorized overtime or, more
forcefully, stealing overtime does not constitute extreme and
outrageous behavior that goes beyond all possible bounds of
decency and is regarded as atrocious.  <u>See</u>, <u>e.g.</u>, <u>Emerson v.</u>
<u>Massachusetts Port Auth.</u>, 138 F. Supp. 3d 73, 76-77 (D. Mass.
2015) ("Massport's alleged actions—accusing plaintiff of
employee misconduct, scheduling disciplinary hearings and
requiring plaintiff's attendance, denying plaintiff access to an

entrance area, and failing to report a workplace injury—do not
rise to this level"). In sum, for all of the above reasons,
summary judgment is warranted on Count IV.

III. <u>Libel and Slander (Count V)</u>

Chammas and Sweeney argue that the defamation claim, which
the amended complaint denotes as libel and slander, is subject
to summary judgment because a number of the statements are time
barred, the statements were of opinion rather than fact, there
was never any publication of the defamatory statements, and the
statements are subject to a conditional privilege. Plaintiff
identifies the untrue statements in generalized terms in the
amended complaint, which states that "Chammas and Sweeney's
written and oral representations about Plaintiff's job
performance" were knowingly false and caused harm to plaintiff's
reputation and employment as well as emotional distress.
(Docket Entry # 110-1, ¶¶ 152-155). Chammas and Sweeney
identify a list of statements that plaintiff stated were untrue
during her deposition. (Docket Entry # 102, pp. 11-13).
Plaintiff does not provide any additional untrue statements in
her opposition. (Docket Entry # 108). As the summary judgment
target with the underlying burden of proof, it was incumbent
upon plaintiff to identify any additional defamatory statements.
Accordingly, the list identified by Chammas and Sweeney, which

the record supports, identifies the operative statements at
issue.

More fundamentally, plaintiff does not address any of the
above arguments raised by Chammas and Sweeney.  Rather,
plaintiff submits that the untrue statements were not made in
furtherance of Dana-Farber's interest.  (Docket Entry # 108).
Plaintiff makes this assertion in response to a mistaken belief
that Chammas and Sweeney are arguing that the exclusivity
provision of the MWCA bars the defamation claim.  (Docket Entry
# 108, p. 4) ("Defendants move to dismiss the counts arising
under tort as barred under the exclusivity provision of the
[MWCA]. . . the counts are . . . Count V, which alleges Libel
and Slander").  Chammas and Sweeney, however, do argue that the
exclusivity bar of the MWCA bars the defamation/libel and
slander claim.

Plaintiff's failure to address Chammas and Sweeney's
arguments that there was no publication, that certain statements
are time barred, that the statements were of opinion rather than
fact, and that the statements are subject to a conditional
privilege constitutes a waiver.  See Vallejo v. Santini-Padilla,
607 F.3d at 7 n.4; Curet-Velazquez v. ACEMLA de Puerto Rico,
Inc., 656 F.3d 47, 54 (1st Cir. 2011) ("[a]rguments alluded to
but not properly developed before a magistrate judge are deemed

waived"). "'Even an issue raised in the complaint but ignored at summary judgment may be deemed waived.'" Audette v. Town of Plymouth, MA, 858 F.3d 13, 23 (1st Cir. 2017) (citations omitted). Simply stated, "[i]f a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived . . ..'" Merrimon v. Unum Life Ins. Co. of America, 758 F.3d 46, 57 (1st Cir. 2014).

Briefly turning to the merits, the statute of limitations, the fact/opinion dichotomy, and the conditional privilege arguments presented by Chammas and Sweeney lead to summary judgment in their favor. A three-year statute of limitations applies to a libel and slander claim. See Mass. Gen. Laws ch. 260, § 4. Drawing the plaintiff-favorable assumption that the claim arises out of the conduct in the original complaint (Docket Entry # 1), the libel and slander claim, which plaintiff raised for the first time in the first amended complaint, relates back to the filing of the original complaint on July 10, 2015. See Fed. R. Civ. P. 15(c)(1)(B). Absent application of the discovery rule, statements prior to July 10, 2012 are untimely.

The discovery rule provides "that a cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or reasonably should know that she may have been harmed by a defendant's conduct, even if the harm actually

49

occurred earlier." RTR Techs., Inc. v. Helming, 707 F.3d 84, 89 (1st Cir. 2013).  The rule "pertains only to those plaintiffs whose injuries are 'inherently unknowable.'"  Id. (citation omitted).  Notably, plaintiff "bears the burden of 'proving both an actual lack of causal knowledge and the objective reasonableness of that lack of knowledge.'"  Koe v. Mercer, 876 N.E.2d 831, 836 (Mass. 2007) (citation omitted).  As established in plaintiff's deposition, plaintiff knew what the purportedly actionable statements were, namely, that she was stealing overtime and that she needed to work more efficiently with fellow team members.  (Docket Entry # 98-1, pp. 33-34, 110).  As to these pre-July 2012 statements, she fails in her burden to show sufficient facts that "take this case outside the statute of limitations."  Catrone v. Thoroughbred Racing Associations of N. Am., Inc., 929 F.2d 881, 885 (1st Cir. 1991) ("plaintiff bears the burden of presenting facts sufficient to take the case outside the statute of limitations").  Accordingly, the following statements are time barred:  Peddle's February 2012 statements that plaintiff was "stealing 15 minutes of overtime every week" and that Chammas said plaintiff would "pay the consequences" for such conduct; and Sweeney's 2009 statement that Sweeney would "like to see [plaintiff] work more efficiently with fellow team members."  (Docket Entry # 98-1, pp. 29-34, 110) (Docket Entry # 102, pp. 11-12).

Next, it is well established that an actionable "statement must be one of fact rather than opinion." <u>Scholz v. Delp</u>, 41 N.E.3d 38, 45 (Mass. 2015), <u>cert.</u> <u>denied</u>, 136 S. Ct. 2411 (2016).  Overall, Chammas and/or Sweeney purportedly made actionable statements in the 2012 performance review, the 2013 performance review, verbal warnings, the final written warning, a January 2014 termination meeting, and the termination letter. (Docket Entry # 98-1) (Docket Entry # 102, p. 12-13).  In addition, Sweeney purportedly lied to Peddle by saying that she had "problems with" plaintiff.  (Docket Entry # 981, p. 28) (Docket Entry # 192, p. 12).

In Massachusetts, a person has "'a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest.'"  <u>Cornwell v. Dairy Farmers of Am., Inc.</u>, 369 F. Supp. 2d 87, 110 (D. Mass. 2005) (quoting <u>Bratt v. Int'l Business Machines Corp.</u>, 467 N.E.2d 126, 131 (Mass. 1984)).  In the employment context, an employer therefore "'"has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job."'"  <u>Thomas v. Sears, Roebuck & Co.</u>, 144 F.3d 31, 34 (1st Cir. 1998) (quoting <u>McCone v. New England Tel. & Tel. Co.</u>, 471 N.E.2d 47, 51 (Mass.

1984)).  Performance evaluations "published" to superiors

reasonably serve an employer's legitimate interest, namely,

evaluating an employee's fitness to do her job, and are

therefore subject to a conditional privilege.  See McCone v. New

England Tel. & Tel. Co., 471 N.E.2d. at 51.  For example,

"claims of libel and slander aris[ing] out of comments made"

during "internal company feedback" as well as "a comment

attributed to an employee that [the plaintiff] was disloyal, a

troublemaker and negative" are conditionally privileged.  Thomas

v. Sears, Roebuck & Co., 144 F.3d at 34.  Finally, statements

retain their privilege "'if the publisher and the recipient

share a common interest and the communication is of a kind

reasonably calculated to protect or further it.'"  Cornwell v.

Dairy Farmers of Am., Inc., 369 F. Supp. at 111 (quoting Sklar

v. Beth Israel Deaconess Med. Ctr., 797 N.E.2d 381, 388 (Mass.

App. Ct. 2003)).  Examining each of the purportedly actionable

statements, they uniformly fall within the conditional privilege

as a matter of law.

It is true that "'[t]he conditional privilege is lost if

the defendant (1) knew the information was false, (2) had no

reason to believe it to be true, or (3) recklessly published the

information unnecessarily, unreasonably, or excessively.'"

Cornwell v. Dairy Farmers of Am., Inc., 369 F. Supp. at 111-112

(quoting Sklar, 797 N.E.2d at 388).  The burden is on plaintiff,

as the employee, to show that the privilege is abused.  Id.
("burden is on the employee, Cornwell, to prove that the
privilege has been abused") (citing Humphrey v. Nat'l
Semiconductor Corp., 463 N.E.2d 1197, 1199 (Mass. App. Ct.
1984)).  As the summary judgment target with the underlying
burden of proof, plaintiff fails to provide sufficient facts to
meet that burden.  Except for self-serving characterizations of
the statements as lies or false, plaintiff makes no argument and
provides insufficient facts for a jury to find that the
statements lost their conditional privilege.  Summary judgment
is therefore warranted on the libel and slander claim.

IV.  Negligent Supervision (Count VI)

     In seeking summary judgment on the negligent supervision
claim in Court VI, Dana-Farber argues that section 24 of the
MWCA bars the claim.  (Docket Entry # 100, p. 11).  As stated in
the amended complaint, Dana-Farber and various supervisors
purportedly failed to "investigate and/or correct properly the
unwarranted and malicious misrepresentations, libel and slander"
of plaintiff even though they were "informed of the aforesaid
tortious and/or intentional misrepresentations."  (Docket Entry
# 110-1, ¶ 157).

     Plaintiff makes a number of the same arguments she asserts
to support the IIED claim.  First, she submits that this court's
prior ruling regarding subject matter jurisdiction has

preclusive effect.  (Docket Entry # 108).  The analysis of this
argument with respect to the IIED claim defeats the argument
with respect to the negligent supervision claim.

Second, plaintiff argues that the negligent supervision
claim "does not claim injuries to Plaintiff's mind or body; it
lays claim to lost wages from Dana-Farber's breach of its duty
to supervise properly and thoroughly its employees," and
therefore the exclusivity provision of the MWCA does not apply.
(Docket Entry # 108).  Plaintiff further argues that the
injuries suffered were not a result of "a bona fide, personnel
action" and therefore the MWCA does not bar the claim.  (Docket
Entry # 108).  In response, Dana-Farber contends that "[i]n
negligence actions, the economic loss doctrine bars recovery
unless the plaintiff can establish that the injuries she
suffered . . . involved physical harm or property damage, and
not solely economic loss."  (Docket Entry # 116, p. 12).

Turning briefly to Dana-Farbers's argument that the MWCA
bars the negligent supervision claim, section 24 of the MWCA
states that "an employee shall be held to have waived his right
of action at common law or under the law of any other
jurisdiction in respect to an injury that is compensable under
this chapter."  Mass. Gen. Laws ch. 152, § 24.  As previously
explained, the exclusivity provision bars common law actions
when, inter alia, the "'condition is shown to be a "personal

injury" within the meaning of'" the MWCA.  Green v. Wyman-Gordon, 664 N.E.2d at 813; accord Roberts v. Delta Air Lines, Inc., 599 F.3d at 77 n.4 (noting that, because plaintiff "suffered a personal injury that arose in the course of her employment, . . . any common law claims against her employer would be barred"); see Clarke v. Kentucky Fried Chicken of California Inc., 57 F.3d 21, 28-29 (1st Cir. 1995) (holding that MWCA "preempted" claims for negligent hiring, supervision, and retention in case in which management allegedly failed to supervise co-workers who harassed plaintiff); Ruffino v. State St. Bank & Tr. Co., 908 F. Supp. 1019, 1052 (D. Mass. 1995) (MWCA's exclusivity provision bars negligent supervision claim alleging that employer "negligently supervised and retained Stuart by failing to prevent his harassment of and discrimination against" plaintiff); see also Johnson v. Amherst Nursing Home, Inc., Civil Action No. 14-30100-MGM, 2015 WL 4750932, at *9 (D. Mass. Aug. 11, 2015) (citing holding in Clarke); Catalano v. First Essex Sav. Bank, 639 N.E.2d 1113, 1116 (Mass. App. Ct. 1994) (complaint alleging emotional injury arising out of "daily 'campaign' of harassment" by co-worker, "of which her employer was on notice but failed to take steps to prevent," had to be brought under MWCA).

Plaintiff therefore appropriately disavows any recovery for personal injuries vis-à-vis the negligent supervision claim.

(Docket Entry # 108, p. 7) ("claim for negligent supervision does not claim injuries to Plaintiff's mind or body; it lays claim to lost wages").[25]  Moreover, a constructive discharge claim for "contract damages" does not seek compensation for personal injuries and is therefore not barred by the MWCA's exclusivity provision.  Felinska v. New England Teamsters & Trucking Indus. Pension Fund, 855 F. Supp. 474, 479 (D. Mass. 1994).  Here too, plaintiff's negligent supervision claim for lost wages does not seek compensable personal injuries under the statute and is therefore not barred by the statute's exclusivity provision.

In response to plaintiff's contention that the negligent supervision claim seeks only lost wages, Dana-Farber submits that the economic loss doctrine bars the claim.  (Docket Entry # 116).  Assuming for purposes of argument that the economic loss doctrine does not provide a basis for summary judgment, this court turns to Dana-Farber's argument that plaintiff simply recasts her discrimination claim as a negligent supervision claim and the exclusive remedy under chapter 151B thereby precludes the claim.  (Docket Entry # 100, p. 12).  Plaintiff does not address the argument.  See Vallejo v. Santini-Padilla,

---

[25]  In essence, plaintiff's claim is that Dana-Farber's breach of its duty to supervise Chammas and Sweeney caused the loss of her employment and thus resulted in lost wages.

607 F.3d at 7 n.4; Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d at 54.

It is well settled that "[c]hapter 151B provides the exclusive remedy for employment discrimination 'not based on preexisting tort law or constitutional protections.'" Galletly v. Coventry Healthcare, Inc., 956 F. Supp. 2d 310, 314 (D. Mass. 2013) (quoting Charland v. Muzi Motors, Inc., 631 N.E.2d 555, 559 (Mass. 1994)). Plaintiff does not distinguish the facts supporting the negligent supervision claim from those that support the chapter 151B claim. Where, as here, "a plaintiff alleges that a defendant's conduct violates both Chapter 151B and pre-existing common law, the common law claims that are 'merely recast versions' of allegations of employment discrimination are barred by Chapter 151B and must be dismissed." Id. (dismissing negligent supervision claim as "barred by the exclusivity provision of Chapter 151B"). Furthermore, the fact that a plaintiff describes the damages she suffered as "flowing from negligent supervision rather than from employment discrimination does not change the essence of" the claim, which was "originally characterized as a discrimination claim." Choroszy v. Wentworth Inst. of Tech., 915 F. Supp. 446, 451 (D. Mass. 1996). Accordingly, the negligent supervision claim against Dana-Farber is subject to summary judgment.

It is also worth noting that Massachusetts law does not recognize a negligent supervision claim brought by an employee against his or her employer based on the latter's purportedly negligent supervision of another employee. See Hall v. FMR Corp., 559 F. Supp. 2d 120, 128 (D. Mass. 2008). Rather, "the tort is limited to violations of an employer's duty to protect *the public* at large from the misfeasance of its employees." Id. (emphasis added). In fact, the court in Choroszy v. Wentworth Inst. of Tech., 915 F. Supp. at 450, "could locate no cases under Massachusetts law in this century in which any federal or state court applied this tort to an employee's suit against his employer." Id.; Bell v. Rinchem Co., Inc., Civil Action No. 4:14-40177-TSH, 2014 WL 11290899, at *18 (D. Mass. Dec. 2, 2014).

## V.   ADEA Claim (Count VII)

In Count VII, plaintiff brings an ADEA claim against Dana-Farber.  Dana-Farber contends that plaintiff fails to make a prima facie case, it provides legitimate reasons for the termination, and plaintiff fails to show that such reasons were a pretext for age discrimination.  (Docket Entry # 100).

The ADEA makes it unlawful for an employer to discharge or take other adverse employment action against an employee who is at least 40 years old "because of such individual's age."  29 U.S.C. § 623(a); see 29 U.S.C. § 631(a).  In an ADEA claim, "the

plaintiff bears the burden of proving that her age was the 'determinative factor' in her discharge, that is, that she 'would not have been fired but for [her] age.'" <u>Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc.</u>, 804 F.3d 127, 129 (1st Cir. 2015).  Where, as here, there is no direct evidence of discrimination, the burden shifting framework established in <u>McDonnell Douglas Corp. v. Green</u> applies. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Velazquez-Fernandez v. NCE Foods, Inc.</u>, 476 F.3d 6, 11 (1st Cir. 2007) (stating the appropriate standard to use in analyzing ADEA claim devoid of direct evidence of discrimination is the <u>McDonnell Douglas</u> burden-shifting analysis).

Under the <u>McDonnell Douglas</u> framework, the plaintiff must first establish a prima facie case.  In order to establish a prima facie case of unjust termination, plaintiff must show that:  (1) she was at least 40 years old; (2) her work met her "employer's legitimate expectations"; (3) she was discharged or suffered an adverse employment action at the hands of her employer; and (4) "the employer filled the position, thereby showing a continuing need for the services that [the plaintiff] had been rendering." <u>Melendez v. Autogermana, Inc.</u>, 622 F.3d 49, 50 (1st Cir. 2010); <u>Del Valle-Santana</u>, 804 F.3d at 129; <u>see also</u> <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 512 (2002) ("precise requirements of a prima facie case can vary depending on the

context and were 'never intended to be rigid, mechanized or

ritualistic'"); Feliciano de la Cruz v. El Conquistador Resort &

Country Club, 218 F.3d 1, 5 (1st Cir. 2000).  Establishing a

prima facie case requires a minimal showing by the plaintiff and

functions to raise an inference of discrimination.  See Texas

Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54

(1981).

If the plaintiff establishes a prima facie case, the burden

of production shifts "to the employer to articulate some

legitimate, nondiscriminatory reason" for the adverse employment

action.  McDonnell Douglas Corp., 411 U.S. at 802; Del Valle-

Santana, 804 F.3d at 130 (once plaintiff establishes "prima

facie case, there is a rebuttable presumption of discrimination,

and the burden shifts to the employer to articulate a

legitimate, nondiscriminatory reason for dismissing the

employee").  In the event the employer provides such a reason,

the plaintiff bears the burden "to show that the employer's

proffered reason is but a pretext, and 'that age was the but-for

cause of the employer's adverse action.'"  Del Valle-Santana,

804 F.3d at 130.  In order to satisfy that burden, "'[i]t is not

enough for a plaintiff merely to impugn the veracity of the

employer's justification; he must "elucidate specific facts

which would enable a jury to find that the reason given is not

only a sham, but a sham intended to cover up the employer's real

motive: age discrimination."'"  <u>Santangelo v. New York Life Ins.</u>
<u>Co.</u>, 785 F.3d 65, 70 (1st Cir. 2015).

A.  <u>Prima Facie Case</u>

    Dana-Farber argues that plaintiff cannot satisfy the second
prong of the prima facie test because "she was not adequately
performing her job duties at the time of her termination."
(Docket Entry # 100, p. 15).  More specifically, Dana-Farber
asserts that plaintiff fell short of Dana-Farber's expectations
in the areas of "teamwork, collaboration, and adaptability."
(Docket Entry # 100, p. 15).  Dana-Farber cites to incidents
such as disobeying managers, sending insubordinate emails, and
refusing to do the filing on January 13, 2014.  (Docket Entry #
100, p. 15).

    This court, however, cannot "consider the employer's
alleged nondiscriminatory reason for taking an adverse action
when analyzing the prima facie case."  <u>Melendez v. Autogermana,</u>
<u>Inc.</u>, 622 F.3d at 51 (considering defendant's stated reason for
firing plaintiff "would 'bypass the burden-shifting analysis and
deprive the plaintiff of the opportunity to show that the
nondiscriminatory reason was in actuality a pretext designed to
mask discrimination'").  Dana-Farber's stated, nondiscriminatory
reasons for firing plaintiff were that she had been provided
many ways she could improve her performance in "the areas of
teamwork, collaboration, and adaptability" and refused to change

her behavior, sent emails to Sweeney showing resistance to her leadership, and failed to complete the requested filing on January 13, 2014.  (Docket Entry # 100, p. 16).  Therefore, because these reasons are identical to those given for why plaintiff did not satisfy the second prong of the prima facie showing, this court cannot rely upon those events to analyze the prima facie case.  See id. ("we cannot 'consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case'").

To show she was meeting the company's expectations, plaintiff provides evidence, through emails, showing that she was receiving praise from other employees and patients.  (Docket Entry # 110-1, ¶ 84) (Docket Entry # 110-20).[26]  There is no indication that plaintiff received any complaint about her performance, either in the form of performance reviews or formal warning, before May 2013.  (Docket Entry # 110-1, ¶ 81).  Additionally, the only evidence that plaintiff received negative feedback or constructive criticism in the nine years prior to 2012 was her testimony, which is not considered for the truth of the matter, that in 2009 she received a comment from Peddle that stated, "I'd like to see [plaintiff] work more efficiently with

---

[26]  As explained in the Memorandum and Order on the motion to strike, the handwritten notations are not considered and the consideration of exhibits attached to plaintiff's affidavit does not alter this court's recommendation to allow summary judgment.

fellow team members on working through cash-related issues."
(Docket Entry # 98-1, p. 30) (Docket Entry 110, ¶ 81).
Plaintiff also provides evidence that she received a 17% raise
in June of 2012.  (Docket Entry # 103, ¶ 23) (Docket Entry #
109, ¶ 23).  Such evidence satisfies the low standard under the
second prong of the prima facie case that plaintiff was meeting
Dana-Farber's legitimate expectations.[27]  See Woodman v.
Haemonetics Corp., 51 F.3d 1087, 1092 (1st Cir. 1995) ("proffer
of substantial wage increases and ten years of positive
performance reviews, blemished by but one negative performance
evaluation" satisfied second prima facie prong in ADEA case);
accord Acevedo-Parilla v. Norvartis Ex-Lax, Inc., 696 F.3d 128,
139 (1st Cir. 2012) (evidence that plaintiff had been at the
company for years with overall positive reviews satisfied the
"low standard" of a prima facie showing vis-à-vis the second,
so-called "'qualified' prong").

B.   Legitimate and Non-Discriminatory Reason for Dismissal

     The next step in the analysis is to determine if Dana-
Farber articulated a legitimate and non-discriminatory reason
for firing plaintiff.  Dana-Farber states, and provides evidence

---

[27]  Separately, the facts set out in the above paragraph provide
sufficient evidence to satisfy the prima showing in a chapter
151B age discrimination claim that plaintiff was performing her
job at an acceptable level, even considering the additional
facts that support the stated reasons for the termination.

to support, that plaintiff received comments in her 2012 and
2013 performance review that she needed to improve in the areas
of teamwork, collaboration, and adaptability. (Docket Entry #
100, p. 16) (Docket Entry # 98-8) (Docket Entry # 103, ¶ 56)
(Docket Entry # 109, ¶ 56). Dana-Farber also produces evidence
showing that in 2013 plaintiff received two verbal warnings,
followed by the final written warning. (Docket Entry ## 97-11,
97-13). In addition, Dana-Farber produces emails from plaintiff
sent after plaintiff was instructed to stop sending long and
convoluted emails that her supervisor, Chammas, found were
"insubordinate" in tone. (Docket Entry ## 97-11, 97-18, 97-12).
Finally, Dana-Farber provides evidence that plaintiff was asked
to do a filing project on January 13, 2014 that she refused to
do, which Chammas also found to be insubordinate. (Docket Entry
# 97, ¶¶ 31-32) (Docket Entry # 98-1, pp. 97-98). Accordingly,
Dana-Farber presents ample evidence to "enable a rational fact
finder to conclude that there existed" non-discriminatory
reasons for plaintiff's firing. Melendez, 622 F.3d at 52
(employer met its burden of providing legitimate, non-
discriminatory reason by stating that employee had failed to
meet sales quota and was one of the poorest performers in
company) (internal quotations omitted); see also Garcia v.
Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008)

(stating that employee was discharged due to her deficient performance was enough for employer to meet its burden).

C.  Pretext and Discriminatory Animus

At this final stage, plaintiff has the burden of proof to "put forth sufficient facts for a reasonable fact-finder to conclude that [the employer's] proffered reason for discharging [the employee] is a pretext, and the true reason behind the firing was discriminatory animus." Melendez, 622 F.3d at 52. Dana-Farber argues that there is no evidence to suggest that Chammas, a decisionmaker, did not believe her characterization of plaintiff's performance or actions.  (Docket Entry # 110, p. 18).  Second, Dana-Farber contends that the decision to close the cashier booth at 3:00 p.m. was not evidence of discrimination.  (Docket Entry # 100, p. 18-19).  Third, Dana-Farber maintains that the fact that the woman hired to replace plaintiff (Johnson) was younger, without more, does not alone support an inference that the reasons given for plaintiff's firing were pretextual.  (Docket Entry # 100, p. 19).  Finally, Dana-Farber asserts that plaintiff's statements that she believed that everything happened to her because of her overtime complaint undercuts the argument that she was fired due to discriminatory animus.  (Docket Entry # 100, p. 20).  Plaintiff submits that:  all the other cashiers before and after plaintiff were substantially younger and were promoted within two years of

hire rather than ten; "defendants" changed the nature of plaintiff's work to aggravate her injury; plaintiff had no negative reviews before 2012; and Chammas and Sweeney acted together to smear plaintiff's reputation.  (Docket Entry # 108).

In assessing pretext, this court must focus "'on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." Mesnick v. General Electric Co., 950 F.2d 816, 824 (1st Cir. 1991) (quoting Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)).  It is not enough:

> for a plaintiff merely to impugn the veracity of the employer's justification; he must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination."

Melendez, 622 F.3d at 52 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990)).  There is a generous threshold to survive summary judgment inasmuch as plaintiff need only adduce "'minimally sufficient evidence to conclude [s]he was fired because of [her] age' or race." Parra v. Four Seasons Hotel, 605 F. Supp. 314, 328 (1st Cir. 2009) (quoting Davila v. Corporation De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 16 (1st Cir. 2007)).  Plaintiff, however, fails to meet this threshold.

First, plaintiff provides no evidence to suggest that Chammas did not believe her characterization of plaintiff's performance.  See Cherkaoui v. City of Quincy, 877 F.3d 14, 27 (1st Cir. 2017).  "'Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its actions that a reasonable fact finder could find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"  Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662-63 (1st Cir. 2010) (citation omitted).  The letter of termination states that plaintiff's "performance continued to be problematic" and identifies the specific ongoing areas of concern as "not working as a collaborative team member and exhibiting unprofessional behavior when interacting with the Accounting Supervisor" and the "refusal to perform, on several occasions, duties [she] was directly asked to accomplish."  (Docket Entry # 98-32).

Plaintiff alleges these statements are false and points to the fact that she did not receive negative reviews until Chammas and Sweeney became her supervisors in 2012.  (Docket Entry # 108).  Plaintiff received the 2012 annual review with the rating "needs further development" in teamwork and collaboration in September 2012.  First, "temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is

not enough." Cherkaoui, 877 F.3d at 27 (1st Cir. 2017) (holding
that even though the employee showed it was not until she began
wearing headscarf that she started having problems with
coworkers, temporal proximity was not alone sufficient to create
a trial issue of fact) (internal quotations omitted).  Second,
there is insufficient evidence for a fact finder to conclude
that the reviews were inaccurate as well as insufficient
evidence that the reasons for the termination were false.

Plaintiff provides little, if any, evidence showing that
there were any inconsistencies or contradictions in Dana-
Farber's proffered reasons for firing plaintiff.  See Gomez-
Gonzalez, 626 F.3d at 662-63.  Rather, there is more than ample
evidence to support the first cited reason for the termination.
For example, the record demonstrates that Chammas received a
complaint from a member of the general accounting department in
2012 that plaintiff was "rude" and documented a number of the
issues with plaintiff's behavior of not being a collaborative
team member and exhibiting unprofessional behavior with her
Accounting Supervisor in two performance reports, the verbal
warning, and the final written warning.  (Docket Entry # 97, ¶
11, second sent.) (Docket Entry ## 97-3, 97-11, 97-13, 98-8).
Additionally, Dana-Farber produces evidence showing that
plaintiff was warned on October 10, 2013 that she had to stop
sending "long and convoluted emails" and that "any future

occurrences of this type of email activity will result in a
written warning." (Docket Entry # 97-11). Yet, plaintiff by
her own admission did not believe she needed to change her
behavior and continued to send emails containing responses such
as a reply email to Sweeney, her accounting supervisor, stating
"when you coming today[,] you can check Dunbar red Book . . .
you coming here once a week and you had chance to check
everything" in response to an email from Sweeney asking when
cash deposits had been picked up and dropped off. (Docket Entry
# 110, ¶ 51) (Docket Entry ## 98-19, 98-20). Chammas viewed
plaintiff's email as insubordinate. (Docket Entry # 97, ¶ 22).

In response to an email from Sweeney asking what was wrong
with the cash register, plaintiff responded by email that
another employee could help Sweeney. (Docket Entry # 98-18).
Chammas was copied on the email and considered the response
"insubordinate in tone." (Docket Entry # 97, ¶ 22).

Turning to the second cited reason for plaintiff's
termination, i.e., that plaintiff refused to perform duties that
were asked of her, the evidence likewise does not support an
inference of pretext. See Gomez-Gonzalez, 626 F.3d at 662-63.
For example, plaintiff refused to do the filing work requested
by Sweeney on both January 6 and 13, 2014. (Docket Entry # 110,
¶¶ 79, 98). Both times plaintiff claimed that she could not
file because of the injuries to her hands that she had sustained

during the fall.  (Docket Entry # 110, ¶¶ 65, 70-71, 98) (Docket
Entry # 98-1, pp. 81-92).  As previously noted, plaintiff took
time off from the afternoon of January 7 to January 11 to
recover from the fall.  (Docket Entry # 98-1, p. 87) (Docket
Entry # 103, ¶¶ 114, 120-121, 123) (Docket Entry # 109, ¶¶ 114,
120-121, 123).  Before returning to work, plaintiff was cleared
by her primary care physician, Dr. Tello, and signed a medical
status determination form stating she was able to perform the
essential functions of her job.  (Docket Entry # 98-31) (Docket
Entry # 103, ¶ 121) (Docket Entry # 109, ¶ 121).  Plaintiff also
acknowledged she "expect[ed] that [she] would be expected to do
some filing in general accounting" upon her return.  (Docket
Entry # 98-1, p. 92).  Yet, on January 13, 2014, plaintiff did
not even attempt to do the filing Sweeney asked her to complete.
(Docket Entry # 110, ¶ 98).  Instead, plaintiff refused to file.
(Docket Entry # 110, ¶ 98).  Sweeney reported plaintiff's
refusal to Chammas and Chammas found plaintiff's refusal to file
insubordinate.  (Docket Entry # 97, ¶ 32).  Chammas emailed
Saunders in HR on January 13, 2013, informing him that plaintiff
refused to file and asked to meet about the matter.  (Docket
Entry # 97-17).  Plaintiff does not dispute that she refused to
do the filing.  (Docket Entry # 110, ¶¶ 79, 98).  Therefore,
there are no inconsistencies or contradictions in the record

that would support an inference that Chammas' reasons were pretextual.  See Gomez-Gonzalez, 626 F.3d at 662-63.

The primary evidence that plaintiff produces to "counter" these and other facts that support the veracity of the stated reasons for the termination are emails from employees in other departments and customers stating what a great job plaintiff was doing and plaintiff's own statements that Chammas and Sweeney's criticisms of her are false.  (Docket Entry ## 110-8, 110-20, 98-14) (Docket Entry # 110-1, ¶¶ 63, 75, 74, 77).  Chammas, however, recognized that plaintiff had a good relationship with other employees and customers in plaintiff's 2012 annual performance review stating, "plaintiff works well and communicates well with employees of other departments."  (Docket Entry # 98-8).  The issue was teamwork and collaboration working with employees *within* the finance department, which plaintiff does not provide sufficient evidence to dispute.  (Docket Entry ## 98-8, 98-32).

Additionally, plaintiff's self-serving statements that she had a good relationship with the employees and was not insubordinate are insufficient to overcome a motion for summary judgment.  See Torrech-Hernandez v. General Electric, Co., 519 F.3d 41, 47 n.1 (1st Cir. 2008) ("[w]e are not obliged to take at face value [the employee's] subjective beliefs when they are not factually based and merely constitute conclusory, self-

serving statements"); see also Vega v. Kodak Caribbean, Ltd., 3
F.3d 476, 479 (1st Cir. 1993) (material creating a factual
dispute "must herald the existence of 'definite, competent
evidence' fortifying the plaintiff's version of the truth").

Plaintiff also insists that the change to her schedule as
well as her work on the filing project are evidence of
discriminatory animus.  (Docket Entry # 108).  Dana-Farber
argues this was a business decision that was not motivated by
plaintiff's age or any discriminatory animus.  (Docket Entry #
100).

There is no evidence to suggest that the change in schedule
had to do with plaintiff's age.  There is also insufficient
evidence to disbelieve the stated reasons for the change in
schedule, which were to allow for other members of the general
accounting team to accomplish more accounting work and to allow
for greater interaction between plaintiff and the rest of the
general accounting department.  (Docket Entry # 97, ¶ 10).
Another reason cited for the personnel move was decreased
"[p]atient payment activity."  (Docket Entry # 97, ¶ 10).
Plaintiff points to this as being a lie in her affidavit and
asserts that even though the data collected showed there was
decreased payment activity, that was because workers avoided
going during lunch time because they knew plaintiff was not
there.  (Docket Entry # 110, ¶¶ 66-67).  There, however, is no

evidence that Chammas knew this and it is therefore not evidence of an inconsistency that would warrant an inference of discriminatory animus.

Plaintiff additionally points to the fact that she was expected to file even though she indicated she had injured her hands. (Docket Entry # 108). Again, there is no evidence that Chammas did not actually believe that plaintiff's refusal to file papers was insubordinate. Plaintiff contests this by stating that Chammas and Sweeney forced her to do "labor intensive filing," even though they knew about her injury and that the activity would cause her discomfort. (Docket Entry # 110-1, ¶ 105). Yet, plaintiff signed a form where she indicated she was able "to perform the essential functions of this job." (Docket Entry # 98-31); see Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996) ("issue is not whether [employer's] reasons to fire [employee] were real, but merely whether the decisionmakers . . . believed them to be real"). While this expectation was likely unfair, there is no evidence of age discrimination associated with it. See Gray v. New England Tel. & Tel. Co., 792 F.2d at 255 (finding it is not "enough to show that the employer acted arbitrarily or with ill will" or "made an unwise business decision" to survive motion for directed verdict because "these facts, even if demonstrated, do not necessarily show that *age* was a motivating factor").

Dana-Farber additionally argues that, even though it replaced plaintiff with someone who was younger, that is not enough to show discriminatory animus. (Docket Entry # 100). As evidence of discrimination, plaintiff points out that her replacement (Johnson) was younger, promoted within two years, and did not have the qualifications plaintiff had. First, plaintiff provides no evidence of Johnson's qualifications. She also does not provide evidence of Johnson's actual age. Dana-Farber, however, acknowledges that Johnson is younger than plaintiff. (Docket Entry # 100, p. 19). Accordingly, this court will assume that Johnson was younger but will not assume that she was more than five years younger than plaintiff given the dearth of evidence regarding Johnson's actual age or even that she was less than 40 years old. Although the deployment of a younger replacement "may be considered as probative circumstantial evidence of age discrimination," it is not by itself enough. Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d at 146 (finding that even statistical data showing that 114 of the last 140 employees hired were under 40 was not enough by itself to defeat summary judgment, even though in combination with other factors, it was). The mere fact that a younger employee replaced plaintiff after she was fired for a legitimate reason is not enough to establish pretext, let alone intent. See Dunn v. Trs. of Boston Univ., 761 F.3d 63, 75 (1st Cir.

2014) (finding that the manager's comment that he was "looking
for someone younger" coupled with the fact that the employee was
later replaced by someone younger was not enough to create a
triable issue of pretext since the employee was the only older
employee to be fired).  Moreover, plaintiff provides
significantly less evidence than there was in Acevedo-Parilla.
She lacks statistical data and, as previously addressed, there
is no other sufficient evidence of age discrimination.  See id.

       In sum, having made a prima facie showing and with Dana-
Farber producing more than sufficient evidence of several
legitimate reasons for the termination, plaintiff fails to show
that these stated reasons for the termination were pretextual.
She also fails to show "that age was the but-for cause of" the
termination.  Del Valle-Santana, 804 F.3d at 130.  Summary
judgment on the AEDEA claim based on the wrongful termination in
Count VII is therefore appropriate.

       As a final matter, to the extent that plaintiff asserts a
failure to promote claim, plaintiff does not provide enough
evidence to support an inference of pretext.  See Garcia v.
Bristol-Myers Squibb Co., 535 F.3d at 31 ("in disparate
treatment cases, comparative evidence is to be treated as part
of the pretext analysis") (internal quotations omitted).
Plaintiff generally argues that "[a]ll the other [c]ashiers,"
who "were substantially younger" than she, were promoted within

two years, whereas, it took plaintiff ten years to be promoted.
(Docket Entry # 108, p. 2).  Plaintiff also puts forth a claim
in the amended complaint that Chammas promised plaintiff that
her "position, title, and salary would be reviewed" and that she
was informed not to apply for more senior roles.  (Docket Entry
# 45, ¶¶ 33-41).

Dana-Farber argues that plaintiff fails to produce enough
evidence to demonstrate a failure to promote.  (Docket Entry #
116, p. 5).  Notably, Dana-Farber argues that plaintiff has "not
made any effort to establish the existence of appropriate
comparators."  (Docket Entry # 116, p. 5 n.5).  Furthermore,
Dana-Farber argues that:  the promotion of younger employees is
not enough to demonstrate disparate treatment; the vague
promotion history of Michlin does not support a failure to
promote claim; and plaintiff did not apply for other positions
within the department.  (Docket Entry # 116, p. 5).

In a disparate treatment case, if there is no direct
evidence, such as here, a plaintiff must show that she was
"treated differently from 'persons situated similarly in all
relevant aspects.'"  Garcia v. Bristol-Myers Squibb Co., 535
F.3d at 31.  While the comparators do not need to be identical,
"'[r]easonableness is the touchstone'" and "'the plaintiff's
case and the comparison cases . . . must closely resemble one
another in respect to the relevant facts and circumstances.'"

76

Anderson v. Brennan, 219 F. Supp. 3d 252, 257 (D. Mass. 2016) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 22 (1st Cir. 1999)).

In the case at bar, plaintiff fails to provide an acceptable comparison case. The record fails to depict a suitable comparator who received an analogous promotion, the actual age of the comparator, and the comparator's qualifications. For example, the record does not include Johnson's actual age or her qualifications. Plaintiff therefore fails to sufficiently show that any comparator closely resembles plaintiff in "'respect to the relevant facts and circumstances.'" Id. The AEDA failure to promote claim is therefore subject to summary judgment.[28] See Garcia, 535 F.3d at 31.

V.   Age Discrimination under Chapter 151B (Count VIII)

Plaintiff asserts a chapter 151B age discrimination claim against Dana-Farber as well as Chammas and Sweeney. (Docket Entry # 45). Like the arguments made to defeat the AEDA claim, defendants submit that plaintiff fails to satisfy the second

---

[28]  For similar reasons, any failure to promote claim based on plaintiff's national origin (Docket Entry # 45, ¶¶ 118–119) (Docket Entry # 108, p. 3), is also subject to summary judgment. In light of the foregoing, it is not necessary to address. It is therefore not necessary to address Dana-Farber's remaining arguments vis-à-vis the failure to promote claim. (Docket Entry # 116, pp. 5–6).

prong of a prima facie case and fails to show the reasons for the termination were pretextual.  (Docket Entry ## 100, 102, 116).[29]

The law under chapter 151B is similar to that under the ADEA, albeit the employee "need only show that the reasons were pretextual."  Costello v. Kirkwood Printing Co., LLC, Civil Action No. 16-11641-DJC, 2018 WL 3510307, at *2 (D. Mass. July 19, 2018); accord Bennett v. Saint-Gobain Corp., 507 F.3d 23, 33 n.2 (1st Cir. 2007).  Simply stated, "[t]o survive a motion for summary judgment, the plaintiff need only present evidence from which a reasonable jury could infer that 'the [employer's] facially proper reasons given for its action against him were not the real reasons for that action.'"  Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016).  Overall, the McDonnell Douglas "three-stage order of proof 'does not circumvent the plaintiff's burden to prove all the essential elements of a discrimination claim, but does permit the jury to infer discriminatory animus and causation from proof that an employer has advanced a false reason for the adverse employment decision, in the absence of direct evidence that the actual motivation was

---

[29]  In seeking summary judgment, Chammas and Sweeney adopt and incorporate the facts, standard of review, and various arguments made in Dana-Farber's supporting memorandum.  (Docket Entry # 102, pp. 1-2, 4).  They also jointly filed the reply brief. (Docket Entry # 116).

discrimination." Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 530 (Mass. 2005). The SJC phrases the second prong of the prima facie case as requiring the plaintiff to show that she was performing "her job at an acceptable level." Id.

Here, there is sufficient evidence to satisfy the second prima facie prong that plaintiff was performing her job at an acceptable level.[30] Defendants, in turn, articulate more than sufficient, legitimate reasons for terminating plaintiff's employment. See generally Massasoit Indus. Corp. v. Massachusetts Comm'n Against Discrimination, 73 N.E.3d 333, 337 (Mass. App. Ct. 2017) (noting, in context of chapter 151B age discrimination claim, that "[o]nce the employee establishes a prima facie case, the employer must articulate a legitimate reason for terminating" employee).

Turning to the existence of pretext, the same reasons regarding the absence of pretext that warrant summary judgment on the ADEA claim lead to summary judgment on the chapter 151B age discrimination claim against defendants. Thus, although plaintiff satisfies the second prong of the prima facie showing under chapter 151B, she does not provide sufficient evidence that the reasons for the termination were pretextual thereby warranting summary judgment on the chapter 151B age

---

[30]   See footnote 27 and related text.

discrimination claim against Dana-Farber and, as explained below, the derivative aiding and abetting chapter 151B claim against Chammas and Sweeney.

Separately, plaintiff completely fails to explain or articulate whether she is asserting a section 4(5) aiding and abetting claim under chapter 151B or a section 4(4A) interference claim under chapter 151B against Chammas and Sweeney.  See Mass. Gen. Laws ch. 151B, § 4(5) ("section 4(5)"); Mass. Gen. Laws ch. 151B, § 4(4A) ("section 4(4A)").  Chammas and Sweeney seek summary judgment on both claims.

Turning to the section 4(5) claim, aiding and abetting liability is derivative of the age discrimination claim against the employer.  See Abramian v. President & Fellows of Harvard College, 731 N.E.2d 1075, 1088 (Mass. 2000); Bennett v. Saint-Gobain Corp., 453 F. Supp. 2d 314, 331 (D. Mass. 2006) ("[b]ecause the company is not liable for age discrimination under state law, there can be no claim against Mesher, the decision-maker, for aiding or abetting discrimination").  Due to the absence of pretext regarding the reasons advanced by Dana-Farber and the resulting absence of chapter 151B age discrimination liability against Dana-Farber, Chammas and

Sweeney are entitled to summary judgment on the section 4(5) aiding and abetting claim.[31]

Section 4(4A) makes it an unlawful practice for "any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter."  Mass. Gen. Laws ch. 151B, § 4(4A).  "In cases based on circumstantial evidence of discrimination," an individual defendant can be held liable if:

> (1) they had the authority or the duty to act on behalf of the employer; (2) their action or failure to act implicated rights under the statute; and (3) there is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant's protected rights allowing an inference to be drawn that there was an intent to discriminate.

Furtado v. Std. Parking Corp., 820 F. Supp. 2d 261, 278 (D. Mass 2011) (finding that employee's claim under 151B section 4(4A) failed because there was no evidence that the managers had the intent to discriminate and the employee admitted no one said anything indicating a bias against disable persons).

Here, plaintiff's failure to address the section 4(4A) argument raised by Chammas and Sweeney or even assert their liability specifically under this section of chapter 151B operates as a waiver.  See Merrimon v. Unum Life Ins. Co. of

---

[31]  It is therefore not necessary to address Chammas and Sweeney's additional argument pertaining to aiding and abetting liability.  (Docket Entry # 102, pp. 4-5).

_America_, 758 F.3d at 57; _Vallejo v. Santini-Padilla_, 607 F.3d at 7 n.4; _Curet-Velazquez v. ACEMLA de Puerto Rico, Inc._, 656 F.3d at 54.  In light of the foregoing, Chammas and Sweeney are entitled to summary judgment on the chapter 151B wrongful termination claim in Count VIII.

As a final matter, to the extent plaintiff raises a failure to promote claim under chapter 151B, defendants argue that plaintiff fails to show similarly situated comparators to survive summary judgment.  (Docket Entry # 116, p. 5 n.5) (citing Massachusetts state court case adjudicating chapter 151B claim).  Plaintiff does not argue that the standards in an AEDA failure to promote claim differ from a chapter 151B failure to promote claim.  See _Goncalves v. Plymouth Cty. Sheriff's Dep't_, 659 F.3d 101, 105 (1st Cir. 2011) (noting that same comparator analysis applies to Title VII and chapter 151B claims, and that the plaintiff makes no claim "that a different standard is applicable to ADEA claims"); see _Matthews v. Ocean Spray Cranberries, Inc._, 686 N.E.2d 1303, 1309-10 (Mass. 1997) (adopting approach used for Title VII claims to chapter 151B claim that, in order to establish pretext based on differential treatment, "plaintiff must identify and relate specific instances where persons similarly situated in all relevant aspects were treated differently") (internal quotations omitted)); see also _Windross v. Barton Protective Servs._, 586

F.3d 98, 104 ("in order to show pretext" in chapter 151B claim,
"the plaintiff must be able to demonstrate that similarly-
situated employees outside of his protected class were treated
differently").  Accordingly, for reasons stated, with respect to
the ADEA failure to promote claim, plaintiff fails to provide
sufficient evidence of pretext based on differential treatment
of persons similarly situated in all relevant respects.  The
chapter 151B failure to promote claim is therefore subject to
summary judgment.

VI.  National Origin Discrimination (Count IX)

       Dana-Farber moves for summary judgment on the Title VII
national origin claim because:  (1) plaintiff fails to show she
was meeting Dana-Farber's legitimate expectations under the
second prima facie prong; and (2) plaintiff cannot show that
Dana-Farber's stated, legitimate, non-discriminatory reasons for
the termination were pretextual.  (Docket Entry # 100, p. 21).
Plaintiff counters that she was meeting Dana-Farber's legitimate
expectations and it was only Chammas and Sweeney's
discriminatory actions that made it appear that she was not
meeting Dana-Farber's expectations.  (Docket Entry # 108).
Plaintiff supports this assertion by pointing to the fact that
she had no negative reviews before 2012.  (Docket Entry # 108).
She also maintains that her refusal to perform manual filing
while she was injured was not a justifiable reason to terminate

her employment.  (Docket Entry # 108).  Plaintiff additionally points to her lack of a promotion between 2003 and 2012 and alleged statements by Chammas and Sweeney making fun of her communication skills as evidence of pretext and discriminatory animus.  (Docket Entry # 108).

Where, as here, there is no direct evidence of discrimination in a national origin discrimination case brought under Title VII, the McDonnell Douglas framework applies. McDonnell Douglas Corp., 411 U.S. at 802.  Dana-Farber cites to its arguments made under Count VII to support the assertion that plaintiff was not meeting Dana-Farber's legitimate expectations under the second prong of the prima facie case and that it provided legitimate nondiscriminatory reasons for plaintiff's termination.  (Docket Entry # 100, p. 21).  Plaintiff does not point to any additional facts relevant to these two parts of the McDonnell Douglas analysis.  (Docket Entry # 108).  Therefore, for reasons stated in sections V(A) and V(B), plaintiff establishes a prima facie case and Dana-Farber identifies legitimate, non-discriminatory reasons for the termination. Thus, this court turns its attention to the third part of the framework and addresses if plaintiff provides sufficient evidence to show Dana-Farber's stated reasons were pretextual. See McDonnell Douglas Corp., 411 U.S. at 802.

As previously explained, "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its actions that a reasonable fact finder could find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"   Gomez-Gonzalez, 626 F.3d at 662-63 (citation omitted).   "One well-established method of demonstrating pretext is 'to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.'"   Kelley v. Corr Med. Servs., Inc., 707 F.3d 108, 117 (1st Cir. 2013).

In seeking to recover under Title VII, plaintiff submits that "Chammas and Sweeney mocked her for her inability to speak English."   (Docket Entry # 108, p. 3).   In moving for summary judgment, defendants elucidate the foregoing generalized allegation by identifying the statement plaintiff identified during her deposition in which Chammas purportedly mocked or made fun of plaintiff's English.   (Docket Entry # 100, p. 22).  The statement is as follows:  in an April 2013 telephone conversation, Chammas "told plaintiff, 'Oh, I'm sorry.  I don't understand you.  What are you talking about?'"   (Docket Entry # 98-1, pp. 126-127) (Docket Entry # 100, p. 22).   Plaintiff also identifies in her affidavit that Chammas informed her that the

85

decision to move her to 10BP was to "better communicate."[32]
(Docket Entry # 110, ¶ 69).  Plaintiff believes that Chammas
pronounced the word "communicate" in a way that conveyed to
plaintiff she was making fun of the fact that English was her
second language.  (Docket Entry # 110, ¶ 69).

A 2006 Supreme Court decision cited by plaintiff, <u>Ash v.
Tyson Foods, Inc.</u>, 546 U.S. 454 (2006), clarifies that while not
all words are benign, courts must consider the speaker's meaning
by looking at various factors including "context, inflection,
tone of voice, local custom and historical usage."  <u>Id.</u> at 456.
The word "communicate" does not have the same historical usage
and bias affiliated with it as the word "boy" in the context of
a racial discrimination claim brought by African-American
employees.  <u>See</u> <u>Ash</u>, 546 U.S. at 455.  Even though Chammas' tone
and inflection can be seen as "criticizing a foreign employee's
facility with the English language," it does not "constitute
discrimination against a particular race or national origin."
<u>Jingyuan Feng v. Rockwell Collins</u>, No. 15-CV-139 2017, WL
589500, at *12 (N.D. Iowa Jan. 10, 2017); <u>see also</u> <u>Montes v.
Vail Clinic, Inc.</u>, 497 F.3d 1160, 1170-71 (10th Cir. 2007)
(upholding policy prohibiting employees from speaking Spanish

---

[32] The above statement is not considered for the truth of the
matter asserted, but rather to show the reason for the decision
and the state of mind of the decisionmaker.

while on the job because "clear and precise communication between the cleaning staff and the medical staff was essential in the operating rooms of the hospital"). Additionally, making a single, critical comment about an employee's accent months prior to a termination is not enough to demonstrate pretext. See Dipigney v. Autozoners, LLC, No. 13-cv-304, 2014 WL 4955657, at *1 (D.N.H. Oct. 2, 2014) (holding that a supervisor telling plaintiff "'I would like you not to answer the commercial calls because customers don't understand your accent'" was not enough to demonstrate pretext) (internal citations omitted).

The court in Dipigney noted that the employee relied on Liberman v. Brady, a case from the Eastern District of New York where discriminatory animus was demonstrated "by a supervisor's harassment and negative treatment of the [employee] coupled with her remark to the [employee] that 'people would be offended by his accent.'" Dipigney v. Autozoners, LLC, 2014 WL 4955657, at *7 (quoting Liberman v. Brady, 926 F. Supp. 1197, 1211 (E.D.N.Y. 1996)). The court in Dipigney found that the supervisor's one comment about the employee's accent did not allow for the same inference of discrimination. Id. Similarly, here, Chammas' statements that she could not understand plaintiff and that plaintiff needed to learn how to better "communicate" do not allow an inference of discriminatory animus or provide a basis to show pretext to survive summary judgment. See id. In sum,

plaintiff's failure to show sufficient evidence of pretext for a jury to find in her favor on the national origin claim warrants summary judgment in Dana-Farber's favor on Count IX.

## VII.  Violation of FMLA (Count XII)

Next, defendants seek summary judgment on the FMLA interference and FMLA retaliation claims. (Docket Entry ## 100, 102). With respect to the interference claim, defendants argue that plaintiff did not have a serious health condition and was not entitled to FMLA leave after her termination. (Docket Entry # 100, 102).[33]  With respect to the retaliation claim, defendants argue there is no evidence that they were motivated by retaliation. (Docket Entry # 100, pp. 24-26).

### A.  Interference with FMLA Leave Benefits

As noted, defendants submit that plaintiff (1) "did not have a 'serious health condition' as defined by the statute; and (2) . . . she was no longer entitled to FMLA leave after her termination." (Docket Entry # 100). Plaintiff submits that she sought FMLA leave because "defendants were insisting upon new filing responsibilities that her injuries were not going to be able to handle" and because of severe emotional and psychological distress. (Docket Entry # 108). Plaintiff

---

[33]  In their motion for summary judgment, Chammas and Sweeney incorporate the arguments put forth by Dana-Farber in its memorandum of law. (Docket Entry # 102, p. 16).

maintains she was never allowed the opportunity to present her illness fully to HR.  (Docket Entry # 108).

The FMLA "protects the right to leave by prohibiting an employer from 'inter[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise' the rights provided by the statute."  Call v. Fresenius Med. Care Holdings, Inc., 534 F. Supp. 2d 184, 191 (D. Mass. 2008) (citing 29 U.S.C. § 2615(a)(1)).  One of those rights entitles an FMLA-qualified employee "to a total of 12 workweeks of leave during any 12-month period."  29 U.S.C. § 2612(a)(1); Wheeler v. Pioneer Developmental Servs., Inc., 349 F. Supp. 2d 158, 164 (D. Mass. 2004).  "To prevail on an FMLA claim, an aggrieved worker must," in addition to satisfying a number of other elements, "establish that she fit the definition of an 'eligible employee[,]'" see 29 U.S.C. § 2612(a)(1), and "that the employer denied her benefits to which the FMLA entitled her."  Wheeler v. Pioneer Developmental Servs., Inc., 349 F. Supp. 2d at 164.  Plaintiff contends that she is entitled to leave because she had a "serious health condition that [made] [her] unable to perform the functions of [her] position."  29 U.S.C. § 2612(a)(1)(D).

A "serious health condition" is defined as an illness that "involves either inpatient care or continuing treatment by a health care provider."  29 U.S.C. § 2611(11); 29 C.F.R. § 825.113.  A patient receives "continuing treatment by a health

care provider" if the patient's illness involves a period of
incapacity that lasts more than three consecutive calendar days
and involves subsequent treatment "relating to the same
condition." 29 C.F.R. § 825.115(a).  To prove incapacity, the
employee must show an "inability to work . . . due to the
serious health condition, treatment," or recovery therefrom.  29
C.F.R. § 825.113(b).  An employee receives treatment:

> for the purposes of FMLA if she receives *treatment* two or
> more times by a health care provider [within 30 days] or
> receives a single treatment by a health care provider which
> results in a "regimen of continuing treatment under the
> supervision of the health care provider."

Id. at 165-66 (emphasis added); see 29 C.F.R. § 825.115(a)(1),
(a)(2).

Plaintiff did experience a period of incapacity as she was
absent from work for three consecutive days from January 8 to
10, 2014 due to the injuries she sustained from the fall.
(Docket Entry # 103, ¶¶ 114, 120-22) (Docket Entry # 109, ¶¶
114, 120-22).  Based on the record and plaintiff's arguments,
she did not, however, receive treatment two or more times by a
health care provider within 30 days.  (Docket Entry ## 98-27,
98-28); see 29 C.F.R. § 825.115(a)(1).  Plaintiff visited Dr.
Tello her primary care physician on January 9, 2014.  (Docket
Entry # 98-28).  Plaintiff, therefore, received a single
"treatment" on this date.  (Docket Entry # 98-28); see 29 C.F.R.
§§ 825.113(c), 825.115(a).  At this appointment, Dr. Tello

90

assessed plaintiff's physical injuries.  (Docket Entry # 98-27).
Plaintiff did not meet with Dr. Tello again until March 28,
2014, several months after her initial visit.  (Docket Entry #
98-27).  Plaintiff makes no argument that her January visits to
OHS constituted treatment "by a health care provider" within the
meaning of the FMLA.  She therefore waives any such argument.
See Coons, 620 F.3d at 44 ("district court was 'free to
disregard' the state law argument that was not developed in
Coon's brief"); Alberti, 2013 WL 6645581, at *8 ("[w]e are not
bound to develop legal arguments merely mentioned in passing").

     Plaintiff also did not receive treatment which resulted in
a regimen of continuing treatment.  See 29 C.F.R. §§ 825.113(c),
825.115(a)(2).  "A regimen of continuing treatment . . .
includes a course of prescription medication" but not over-the-
counter medication.  Wheeler, 349 F. Supp. 2d at 165; 29 C.F.R.
§ 113(c).  Notably, after assessing plaintiff's injuries, Dr.
Tello did not prescribe prescription medication or recommend any
further treatment for plaintiff's wrist pain.  He also cleared
her to return to work on January 10, 2014.  (Docket Entry # 98-
27).  In fact, plaintiff indicated that she was able to perform
the essential functions of her job on January 13, 2014.  (Docket
Entry # 98-31) (Docket Entry # 98-1, p. 92) (plaintiff admitted
"she would expect that [she] would be expected to do some filing
in general accounting").  Therefore, plaintiff's physical

injuries do not constitute a "serious health condition" within
the meaning of the FMLA as a matter of law.  29 C.F.R. §§
825.113(c), 825.115(a).

As to plaintiff's alleged mental condition, plaintiff does
not meet the definition of having a "serious health condition."
The three days that plaintiff was absent from work were due to
her physical injuries, as all her clearances to return to work
related to the physical injuries.  (Docket Entry # 98-30)
(employee charting note stating "x-ray of [plaintiff's] right
hand and wrist were negative.  The note clears her for work");
(Docket Entry # 98-29) (note from Dr. Tello stating, "My patient
. . . is recovering from a fall and sprain of the right hand and
wrist . . . [she] is cleared medically to return to work"); see
29 C.F.R. § 825.113(b), 825.115(a).  At best, Dr. Tello
indicated that plaintiff had "anxiety" on January 9, 2014 and
suggested that plaintiff see a therapist.  (Docket Entry # 98-
28).  Plaintiff, however, was not "interested in any medications
for sleep or anxiety" at the time although she did make the
January 23, 2014 appointment to see a psychologist.  (Docket
Entry # 98-28) (Docket Entry # 110-72).  In light of the above,
plaintiff fails to provide sufficient evidence that would allow
a jury to find that her mental condition constituted a "serious
health condition" by itself or even in combination with her
physical injuries.  See 29 C.F.R. §§ 825.113(b), 825.115(a).  In

sum, because plaintiff does not meet the requisite threshold for having a "serious medical condition," the FMLA interference claim is subject to summary judgment.  See 29 C.F.R. §§ 825.113, 825.115.

B.  Retaliation For Exercising FMLA Leave

Plaintiff does not explain in detail the basis of her retaliation claim, but generally asserts that defendants "terminated [her] employment when she requested to be allowed to seek treatment and/or an accommodation" under the FMLA.  (Docket Entry # 110-1, ¶ 186).  Defendants argue that plaintiff cannot establish the necessary "'but-for' casual connection" of a prima facie showing between her January 16 meeting with Perez-Thornton to discuss FMLA leave and plaintiff's termination.  Defendants also argue that plaintiff "was terminated for legitimate non-retaliatory business reasons."  (Docket Entry ## 100, 102).  Finally, they maintain that plaintiff cannot show that Dana-Farber's stated reasons for the termination were a pretext for retaliating against her for inquiring about FMLA leave.  (Docket Entry ## 100, 102).  Overall, plaintiff cannot show that her FMLA inquiry with Perez-Thornton was casually related to her termination, according to defendants.  (Docket Entry ## 100, 102, 116).

In the absence of direct evidence of "discrimination, the McDonnell Douglas burden-shifting framework applies to claims

that an employee was discriminated against for availing himself of FMLA-protected rights." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998).  In order to establish a prima facie case of retaliation, a plaintiff must show "(1) she availed herself of a protected FMLA right; (2) she was 'adversely affected by an employment decision;' and (3) 'there was a causal connection between her protected conduct and adverse employment action.'" Carreo-Ojeda v. Autoridad De-Energia Electrica, 755 F.3d 711, 719 (1st Cir. 2014) (citation omitted); accord Chacon, 99 F. Supp. 3d at 214 (quoting Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 113-14 (1st Cir. 2006)).

It is true that plaintiff was terminated on the same day she met with Dana-Farber's leave coordinator, January 16, 2014. Temporal proximity, however, is not by itself enough where, as here, the surrounding circumstances undermine any casual connection.  See, e.g., (Docket Entry # 103, ¶ 145) (Docket Entry # 109, ¶ 145); see Carrero-Ojeda, 755 F.3d at 720 (temporal proximity is one factor but not enough, especially "if the surrounding circumstances undermine any claim of causation").  Plaintiff provides no evidence to show that Chammas, a decisionmaker, was aware of plaintiff's request for leave.  In fact, the record establishes that Chammas had already decided to terminate plaintiff before she met with OHS.

94

<u>Carrero-Ojeda v. Autoridad de Energia Electrica</u>, 755 F.3d at 720 (dismissing FMLA retaliation claim while noting that "the key point is that both the investigation and the alleged animus pre-existed Carrero's October 2010 attempt to take FMLA leave"). Plaintiff therefore fails to satisfy the causation prong of a prima facie showing.

As previously explained, defendants provide legitimate reasons for the termination. Defendants' argument that plaintiff fails to show pretext also provides an alternative basis to allow summary judgment on the FMLA retaliation claim. Here again, the temporal proximity is not enough, particularly in the context of the absence of evidence showing that Chammas knew about plaintiff's inquiry and that she made the decision to terminate plaintiff before plaintiff inquired about FMLA leave. The reasons given for the termination were not a pretext to mask a retaliatory motive. Defendants are therefore entitled to summary judgment on Count XII.

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[34] that the defendants' motions for summary judgment

---

[34] Any objection to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included. <u>See</u> Fed. R. Civ. P. 72(b). Any party may respond to another party's objections within 14 days after service of the objections. Failure to file

(Docket Entry ## 99, 101) be **ALLOWED** as to counts III, IV, V, VI, VII, VIII, IX, and XII.  Count II remains in this action.[35]

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

objections within the specified time waives the right to appeal the order.
[35]  See footnote two.